[Crim. No. 6888.   Second Dist., Div. Three.   June 21, 1960.]

THE PEOPLE, Respondent, v. EDDIE GIVENS, Appellant.

Eddie Givens, in pro. per., for Appellant.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

FORD, J.—The appellant was accused of having committed the crime of assault with a deadly weapon in violation of section 245 of the Penal Code. It was further alleged in the information that he had theretofore been convicted of three felonies for each of which he had served a term of imprisonment in a state prison. He waived his right to trial by jury and was found guilty of the offense charged. The court found the allegations as to the prior felony convictions to be true. The appellant's motion for a new trial was denied and he was sentenced to the state prison for the term prescribed by law. He appeals from the judgment and from the order denying his motion for a new trial.[1]

---

[1]The foregoing statement of facts is based upon the information and the minutes of the court as shown by the clerk's transcript. While the appellant does not contend that the minutes do not correctly state the proceedings had, it is to be noted that the reporter's transcript sets forth the following with respect to the proceedings after the motion for a new trial had been denied and counsel for the appellant had stated that there was ''[n]o other legal cause'' why judgment should not be

██ The contention of the appellant is stated to be that the evidence is insufficient to justify the conviction in that the evidence shows that he acted in self-defense. Keeping in mind that on this appeal the evidence is to be viewed in the light most favorable to the prosecution (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778] ; *People* v. *Carnavacci,* 119 Cal.App.2d 14, 16 [258 P.2d 1127] ; *People* v. *Renek,* 105 Cal. App.2d 277, 281 [233 P.2d 43] ; *People* v. *Von Benson,* 38 Cal. App.2d 431, 434 [101 P.2d 527] ), a summary of the evidence which is pertinent to the issue thus raised will be given.

Hubbard M. White, the person who is alleged to have been the victim of the assault, testified as follows : On February 10, 1959, at about 10 p.m. he was in front of 235 West 82d Street in Los Angeles in the presence of the appellant and a woman known as Patricia Washington. The appellant and White had a fight over Patricia. The appellant had asked Patricia ''which one did she want'' and she had answered that she wanted White. The appellant said, ''Well, I'm going to get you, anyway,'' and the fight ensued. White was stabbed in the back and was cut from his left ear down to the lower part of his chin. He did not see a knife in the appellant's hand. White was not confined to a hospital but he received stitches on his ear and in his back. On cross-examination, White said that he had come to the house located at the address above-stated earlier that evening and had gone in and asked for Patricia. The appellant told him that he, the appellant, had obtained and furnished the house for Patricia. He told White not to come around the house. White told him he would be back. White then went over to the home of Patricia's mother and found Patricia. He and Patricia then returned to the street in front of the 82d Street premises but in separate automobiles. The appellant was standing in the driveway. When White got out of his car, the appellant called to him and to Patricia. There was a discussion in the street. After Patricia stated that she wanted White, the appellant said, ''Hubbard,

pronounced: ''THE COURT: There being no legal cause why judgment and sentence should not be pronounced, it is the judgment and sentence of the Court that probation is denied. The Court will determine the prior to be true. The defendant is remanded to the custody of the Sheriff to be by him delivered to the Director of Corrections, Chino, California.'' Under the circumstances of this case, we conclude that the recital of the proceedings by the clerk of the court in his minutes should prevail as against the reporter's transcript. (*In re Evans,* 70 Cal.App. 2d 213, 216 [160 P.2d 551]; *People* v. *Riccardi,* 50 Cal.App. 427, 435 [195 P. 448]; see *People* v. *Bier,* 59 Cal.App.2d 313, 317 [138 P.2d 738]; *People* v. *Sander,* 59 Cal.App. 82, 85 [209 P. 1027]; *cf. People* v. *Hymes,* 161 Cal.App.2d 668, 673-674 [327 P.2d 219].)

you got her," and White "thought it was all over." White had a knife on this occasion, "a little old small knife" that he usually kept in his car "to clean battery cables." It was a straight blade knife about six inches long. It was "sticking" in his outside coat pocket. He described the scuffle as follows: "Q. And during the scuffle, you had your knife out and he had his knife out, isn't that true? A. No, I didn't have my knife out. When I got stabbed and cut, I never—my knife wasn't out. I mean, it happened so—you know, so sudden, see, after he told me, 'Okay, Hubbard, you got her,' I figured that was it. Q. Well, you did pull out your knife, didn't you? A. Yeah, after he had backed me up to my car. I had backed up to my car. Q. Nobody had been cut at the time that you got your knife out, had they? A. Yeah, I had. Q. Where? A. I was bleeding from the back and the neck. After I pulled out my knife, he went on back there where Patricia was. . . . Q. Now going back to the question that I asked you, you scuffled and went down about twenty or twenty-five feet down the block during the scuffle, did you not? A. My car was parked twenty-five feet from where we was scuffling and I didn't go past my car. Q. How far did you go from where the altercation first started until you wound up —— A. How far did we go? Q. Yes. A. I'd say I back [*sic*] about fifteen feet. Q. All right. And at that time, when you got to that point, fifteen feet away, the defendant broke loose and went back to his house, didn't he? A. Well, after I pulled my knife, he did. Q. And you had had your knives out during this scuffle this fifteen or twenty feet, hadn't you? A. It was somewhere between it I pulled my knife out. It was after I got cut and stabbed. Q. All right. Then you got in your car? A. That's right, and drove off." On redirect examination, White further testified as follows: "Q. When did you first see a knife in the defendant's hand? A. Well, when did I first—well, it was at the time we were backing up to my car, I was backing toward my car. I mean, when he first stabbed me and cut me, I didn't see it. Q. When he was backing up to the car you saw the knife for the first time, is that right? A. That's right. Q. Is that when you pulled your knife out? A. That's right." On further cross-examination, he said that he had put the knife in his pocket because Patricia said she was afraid.

As a witness, Patricia Washington gave her version of the occurrence. After she made her choice of White, the appellant "pulls this knife" and told White that, in the words of the witness, "he still ought to cut his throat." White said,

"Well, all right, go ahead." The appellant then cut White in the back and on his neck and ear. On cross-examination, she stated that she was presently living with White but she had formerly lived with the appellant. She first saw a knife in the appellant's hand when he told White that he still "ought to cut" his throat. She did not see a knife in White's hand at that time. When the two men got farther down the street toward the light, she saw that each had a knife in his hand. On further cross-examination, she testified as follows: "Q. Now, when they started scuffling did you then see a knife in Mr. White's hand? A. Yes. Q. Did you see a knife in Mr. Givens' hand? A. Yes." On redirect examination, she said that she did not see a knife in White's hand before the altercation started.

Officer Lewis Nall testified to a conversation with the appellant in which he said that both he and White had pulled their knives. He also said, "I blew my top and I pulled my knife and we began slashing at each other in the middle of the street."

The appellant testified in his own defense. His home was at 235 West 82d Street. He had been living there with Patricia since he was released from the hospital on the 4th of the month (February). On the evening of the 10th, Patricia had taken his car and gone to her mother's to do some washing. White came to the house thereafter and "walked right on in" when the appellant opened the door. He asked where Pat was. The appellant told him not to come back looking for Pat anymore. When White left, he said he would be back. The appellant telephoned Patricia to come home and he then waited "in front of the driveway." He further said that when White and Patricia returned, "I observed him putting something in front of his pocket and after he got closer to me I could see it was a paring knife." As to the conversation and subsequent scuffle, he testified as follows: "Q. What was said and by whom? A. At first it was by me. I said, 'Pat, what is going on here?' He said, 'Let's get it all straight—You want him or you want me?' and she said, 'I want him.' Q. Was anything said after that? A. He told me, 'Well, I guess you are satisfied, you so-and-so; get your things and flit.' Q. Did you say anything to him? A. I cursed him. Q. What happened after that? A. Well, he made as if to go to his waist band so I pulled my knife and the two of us went together, he, as a matter of fact, he went to his waist band. Q. Tell us exactly what he did in that regard. A. Well, after he made this re-

mark, I cursed him. He sort of now acted like he wanted to move in on me so he made sort of a step toward me, so I stepped towards him too. At the same time he was coming up and in his waist band he had something which I know was his knife. I just come over with my knife and we both went together. Q. Well, the two of you went together. In what manner would you say that you went together? A. Well, just what I might say, two men tussling, you know, just trying to keep one another off the other one, you know. He was trying to get to me and I was trying to get to him. Q. Now, during this scuffle do you recall making any strike or stab toward him? A. Personally I don't remember. All I know is he was trying to hold his right hand. He was trying to hold my hand and I guess during the scuffling I was unfortunate enough to hit him. Q. Did you even know where he got cut? A. Actually I didn't know he was cut. Q. Approximately how long did this scuffle take place? A. Oh, roughly, I would say about two and a half or three minutes or so. We scuffled about some where we first originally were standing, we tussled about ten or fifteen feet down the street. Q. What caused the tussling or scuffling to stop at that time? A. Well, after he broke away from me and walked over towards his car, I just turned to his car and walked on up the street to where Patricia was. Q. When it stopped, that was the first time you all had been apart? A. That is right. Q. Did you at any time intend to cut him or stab him? A. I don't think so, no. Q. When you first pulled your knife, what did you have in mind? A. Well, to be truthful, I was trying to keep him off of me because I just came out of the hospital and I wasn't in no shape to be fighting anyone. I had been in the hospital eight months and I wasn't in no shape to be fighting.'' On cross-examination, he testified that his knife was a pocket knife with a blade about two and a half or three inches long.

The appellant is, in effect, asking this court to reweigh the evidence and to accept as true the testimony offered on his behalf as to the nature of the affray while rejecting that which was offered by the prosecution. We are not at liberty to do so. (*People* v. *Carnavacci, supra,* 119 Cal.App.2d 14, 16.) The evidence produced by the prosecution, if believed, as it was by the trial court, sustains the finding of guilt. (*People* v. *Walker,* 99 Cal.App.2d 238 [221 P.2d 287] ; *People* v. *Kersey,* 154 Cal.App.2d 364 [316 P.2d 52] ; *People* v. *Arguilida,* 85 Cal.App.2d 623 [193 P.2d 478].) In weighing the evidence, the trier of fact was free to believe the account of the scuffle

as related by the witnesses White and Washington and to reject that of the appellant. (*People* v. *Walker, supra,* 99 Cal. App.2d 238, 243; *People* v. *Kersey, supra,* 154 Cal.App.2d 364, 366, 367.) The record discloses no basis upon which to set aside the finding of the trial court that the appellant was the aggressor and did not act in self-defense.

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.