[Civ. No. 40939. Second Dist., Div. Five. Dec. 13, 1973.]

HENRY M. McLAUGHLIN, Plaintiff and Appellant, v.
BOARD OF MEDICAL EXAMINERS, Defendant and Respondent.

**COUNSEL**

Richard K. Quan for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Henry Lewin, Deputy Attorney General, for Defendant and Respondent.

**OPINION**

**HASTINGS, J.**—On March 9, 1971, the executive secretary of the Board of Medical Examiners (hereinafter "board") caused to be filed an accusa-

tion against Dr. Henry M. McLaughlin, appellant, charging him with unprofessional conduct as defined in Business and Professions Code section 2361, subdivision (e),[1] in that appellant had committed an act involving moral turpitude, to wit, soliciting a male adult to engage in a lewd or dissolute act.

The matter was heard by Milford A. Maron, hearing officer of the Office of Administrative Procedure. Appellant appeared in person and was represented by counsel. The hearing officer prepared and filed with the board a proposed decision containing findings of fact, determination of issues and order. He found the charge to be true and recommended that appellant's license to engage in the practice of medicine and surgery be revoked, provided, however, that execution of the order of revocation be stayed and that appellant be placed on probation for a period of five years, upon several terms and conditions: (1) he shall comply with all the laws of the United States and the State of California and its political subdivisions and with the rules and regulations of the board; (2) he shall remain under the direction and supervision of a psychiatrist until said psychiatrist shall discharge him as cured; and that while appellant is under the care of his psychiatrist, the psychiatrist shall provide the board with quarterly reports as to the progress of appellant's rehabilitation from his problem.

The board adopted the hearing officer's proposed decision in its entirety as its decision to become effective on February 28, 1972.

Appellant filed in the Los Angeles Superior Court a petition for a writ of mandate pursuant to Code of Civil Procedure section 1094.5, and on the same date the Los Angeles Superior Court issued an alternative writ and stay order. The board filed its return by way of answer to the petition. On July 20, 1972, a hearing on the petition was held wherein the entire administrative transcript was admitted into evidence. Thereafter, the court executed and caused to be filed a judgment wherein the writ was denied and the alternative writ was discharged. The court noted that it had received and read all documents filed, including the administrative transcript, and had made an independent evaluation of the evidence. Findings of fact and conclusions of law were neither requested nor prepared.

Appellant filed a timely notice of appeal from the judgment. On September 14, 1972, this court issued a writ of supersedeas staying the judgment of the superior court pending the determination of this appeal or until further order of this court.

1. Appellant contends that there is insufficient evidence to support a

---

[1]Business and Professions Code section 2361, subdivision (e), defines unprofessional conduct as "The commission of any act involving moral turpitude, dishonesty, or corruption, whether the act is committed in the course of the individual's activities as a certificate holder, or otherwise, or whether the act is a felony or a misdemeanor."

finding that the act involved "moral turpitude"; and, at most, the "conduct" attributed to appellant constitutes simple battery, and that the evidence falls short of proving "a solicitation to engage in a lewd or dissolute act."

■ At the hearing for the writ of mandamus, the trial court was required to exercise its independent judgment based on the evidence before it in deciding the issues. We are required to sustain the trial court's decision if it is supported by credible, competent evidence. All conflicts must be resolved in favor of the trial court and on legitimate and reasonable inferences indulged in to uphold the result reached. (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308-309 [196 P.2d 20]; *Grannis* v. *Board of Medical Examiners,* 19 Cal.App.3d 551, 563 [96 Cal.Rptr. 863].)

■ Findings of fact and conclusions of law were waived; thus, findings necessary to support the judgment will be implied, and if there is substantial evidence to support the judgment, it must be affirmed. (*Small* v. *Smith,* 16 Cal.App.3d 450, 455 [94 Cal.Rptr. 136].)

Appellant was arrested and charged with violation of Penal Code section 647, subdivision (a).[2] A summary of the arresting officer's testimony is that he was standing at the urinal in a public rest room located in a restaurant[3] and appellant was sitting in a commode, partially partitioned, nearby; that he (the officer) saw appellant's head appear around the partition and that appellant looked at him, smiling; that appellant then motioned to him with his right hand, moving the palm toward himself, and he whispered, "Come here"; that he (the officer) then zipped up his pants and walked over to appellant and stood there in front of him. Appellant then grabbed the officer's pants around his private parts and stated, "Unzip your pants." The officer then arrested appellant.

The substance of appellant's testimony is that he suffers from diverticulosis of the colon (which causes diarrhea) and was required to stop at the rest room which was approximately five minutes from his office, because he did not think he could reach his office without having an accident. After he had relieved himself, the arresting officer came in and went to the urinal, then stepped back in front of appellant in a crouching manner. Appellant, believing the officer was about to touch him, moved his left hand up to stop him and touched his body. The officer then said, "What do you like to do?" and appellant replied, "I don't want to do anything."

---

[2]Appellant was arrested for violation of Penal Code section 647, which provides: "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: (a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view."

[3]The arresting officer had gone to this rest room because other arrests involving homosexual activity had been made there, and it was considered a problem area. Entry into the rest room could be made from the parking lot.

This testimony created a conflict in the evidence, and the credibility of that testimony was a matter to be determined by the trier of fact. (*People* v. *Simpson,* 43 Cal.2d 553, 562-563 [275 P.2d 31].) This court cannot reweigh evidence. (*People* v. *Givens,* 182 Cal.App.2d 75, 79 [5 Cal.Rptr. 648].) Reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding.

The cases fully support the conclusion of the trial court that the act in question was an offense involving moral turpitude, and thus a violation of Business and Professions Code section 2361, subdivision (e). (*Morrison* v. *State Board of Education,* 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375]; *In re Boyd,* 48 Cal.2d 69 [307 P.2d 625]; *In re Phillips,* 17 Cal.2d 55 [109 P.2d 344, 132 A.L.R. 644]; and *Moser* v. *State Bd. of Education,* 22 Cal. App.3d 988 [101 Cal.Rptr. 86].)

2. Appellant's next contention is that the alleged conduct bears no relation to his practice of medicine; that there is no evidence to prove he is unable to practice or is a danger to his patients. The key cases cited by appellant to substantiate this theory are *Norton* v. *Macy,* 417 F.2d 1161 [135 App.D.C. 214]; *Morrison* v. *State Board of Education,* 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375]; *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67 [64 Cal.Rptr. 785, 435 P.2d 553]; and *Hallinan* v. *Committee of Bar Examiners,* 65 Cal.2d 447 [55 Cal.Rptr. 228, 421 P.2d 76].

*Morrison* is the principal case, as it summarizes in detail the California law on the subject, including cases cited by appellant. Briefly, Morrison was a school teacher. For a one-week period, while he was experiencing severe emotional distress, he engaged in a limited, noncriminal physical relationship with another man, which he described as being of a homosexual nature. He was never accused or convicted of any criminal activity. The State Board of Education, after a hearing, revoked his life diplomas. The California Supreme Court reversed. However, *Morrison* and the other cases do not reach the instant problem. *Moser* v. *State Bd. of Education, supra,* 22 Cal.App.3d 988, does, however, and succinctly clarifies the law and directs us to our conclusion here. Moser, a school teacher, in public view and in a public rest room, engaged in a lewd act. He was convicted of a violation of section 647 of the Penal Code. The State Board of Education revoked his teaching credentials. A writ of mandate to compel rescission of the board's action was denied by the superior court. The Court of Appeal affirmed, stating inter alia, at pages 990, 991: "In *Morrison,* the conduct in which the teacher had engaged occurred in a private place, and no criminal activity was charged. Similarly, in *Norton* v. *Macy,* 417 F.2d 1161, cited by appellant, the situation involved purely private conduct. The court commented at page 1167 that: 'There is no evidence that [appellant] was ever engaged in any offensive conduct in public,' [fn. 27] and 'Appellant

. . . neither openly flaunts nor carelessly displays his unorthodox sexual conduct in public.' In the instant case, appellant committed the acts in a public place and in public view. . . .

"In *Morrison,* on the other hand, the conduct was of a non-criminal nature, and the teacher was neither accused nor convicted of any criminal activity. . . ."

The recent California Supreme Court case of *Pettit* v. *State Board of Education,* 10 Cal.3d 29 [109 Cal.Rptr. 665, 513 P.2d 889], agrees that the two distinctions are important, saying, at page 34: ". . . we note several important factors which would distinguish *Morrison* from the instant case. In *Morrison,* the unspecified conduct at issue was noncriminal in nature, . . . A second distinguishing feature between *Morrison* and the instant case is, of course, that in *Morrison* the conduct at issue occurred entirely *in private.* . . ." (Italics in original.)

Appellant, however, minimizes the criminal aspect, citing *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 73 [64 Cal.Rptr. 785, 435 P.2d 553], for the following rule: "The purpose of an action seeking revocation of a doctor's certificate is not to punish the doctor but rather to protect the public. (Cf. *In re Rothrock, supra,* 16 Cal.2d 449, 454 [106 P.2d 907, 131 A.L.R. 226] (disbarment); *Hallinan* v. *Committee of Bar Examiners, supra,* 65 Cal.2d 447, 462 [55 Cal.Rptr. 228, 421 P.2d 76] (certification for admission to the bar).) While revocation of a certificate certainly works an unavoidable punitive effect, the board can seek to achieve a legitimate punitive purpose only through criminal prosecution. Thus, in this proceeding the inquiry must be limited to the effect of Dr. Yakov's actions upon the quality of his service to his patients." (Fn. 6.) and *Mindel* v. *United States Civil Service Commission,* 312 F.Supp. 485, 487, where the Court said, "Even if [his] conduct can be characterized as 'immoral,' he cannot constitutionally be terminated . . . on this ground absent a *rational nexus* between this conduct and his duties."

Appellant was 46 at the time of his arrest. An analysis of his responsibilities and his professional duties with his patients is not required here. Suffice it to say that as an internist he is in intimate physical contact with his patients, and while he may be dedicated to treating them in an exemplary professional manner, the opportunity to falter and his frailty in exercising restraint exist. Unfortunately, appellant's problem apparently stays with him most, if not all of the time; and in light of his present conduct, there is little assurance that it will be relegated to isolated places and occasions away from his patients.

We conclude that the board and the trial court had adequate evidence

upon which to conclude that appellant's conduct would seriously involve his patients in the reasonably foreseeable future for the following reasons:

The distinction between a private, noncriminal act (*Morrison*) and a criminal act committed in a public place is obvious. Appellant has responded to an apparent sexual desire that has caused him to "openly [flaunt and] carelessly [display] his unorthodox sexual conduct in public." (*Norton v. Macy, supra,* 417 F.2d 1161, 1167.) He has demonstrated an inability to control his desire.

In *Goldsmith* v. *Board of Education,* 66 Cal.App. 157, 167 [225 P. 783], the court noted that standards of conduct when applied to the profession or trade involved could vary. Goldsmith was a teacher, and his habits, good name, cleanliness, associations and other characteristics were important because the teacher is entrusted with the custody of children. Here, appellant is a sole practitioner specializing in internal medicine with a subspecialty in cardiology. He has some patients in their twenties and thirties, though most are middle-aged or older.

Appellant argues that psychiatrists' reports received in evidence indicate that he can continue his practice without danger to his patients. Immediately after his arrest, at his attorney's suggestion, he consulted a Dr. Halden, and commenced weekly psychotherapy. He was also seen by a Dr. Karme for a psychiatrist's evaluation and by a Dr. Silverman for psychological testing. Written statements or reports from each were received in evidence. We must conclude that the board considered carefully the contents of these reports.

While Dr. Karme stated that he did not feel appellant was any danger to society or to his patients, many other facts and comments in these reports clearly justify the contrary conclusion and the action of the board and the trial court: First, the record indicates that this was not an isolated act and discloses two other instances of possible overt acts of a similar nature; one involved an arrest, and in Dr. Karme's report is the following statement: "In 1960 he [Dr. McLaughlin] was charged and convicted of a public disturbance. Initially he was charged with oral copulation but this charge was reduced."

Dr. Karme included in his report the psychological testing report on appellant given by Dr. Jerome Silverman which contained, among other things, the following: "Projective test data reveals that this man's reality contact is well within the Normal range. He shows a tremendous capacity to relate to others in a deep and warm loving way, however, there is a phobic quality to interpersonal relationships which force him to surpress [*sic*] these longings and desires and, consequently, keep people at a distance. One of the most threatening types of interpersonal relations has to do with women

who are seen as extremely phobic, extremely threatening objects. One example of his feelings, along these lines had to do with a Rorschach response to an anatomical figure which he described as a 'malignant or deformed structure' which, in the next breath, he indicated 'it looks like a vagina.' One of the factors behind this phobic quality has to do with his own self concept and personal identity. Although there were no clear-cut indications of cross-sex identity, his own masculine role is rather ambiguous. Therefore, there is a great deal of anxiety on his part with regard to the masculine role, particularly with regard to heterosexual areas. By the same token, heterosexual encounters are not only impaired by his own self doubts with his masculine role and his ability to perform, but they are also connected to his negative view of women as indicated in the previously mentioned Rorschach response."

The doctors concurred in their reports that appellant has a problem that needs psychotherapy.

As stated earlier, we are required to sustain the trial court's (and the board's) decision if it is supported by credible, competent evidence. We have cited detailed portions of the record where experts have given the required quantum and quality of evidence necessary to satisfy this well-established rule. It is significant that it was, initially, the Board of Medical Examiners (ten licensed physicians and one member of the public) who determined that his problem might affect him in the practice of his profession, unless he was subject to enunciated safeguards. It is reasonable to assume that the medical doctors sitting on the board relied on their own training and medical practice (after a consideration of the evidence which was in the record before them) in considering this likelihood of danger in his conduct in relation to his patients and practice, absent psychotherapy. This same expertise provided the belief that the psychiatric assistance might be all that was necessary to alleviate the hazard they recognized as involving patients, rather than the direct imposition of a revocation of license. This studied medical opinion is clearly observable through their imposition of the *condition* that he remain under the direction and supervision of a psychiatrist for the duration of the probationary period, unless previously discharged as cured, rather than forthwith suspending his license to practice.

■ We conclude that the board did not abuse its discretion or exceed its jurisdiction in the penalty imposed. As indicated above, the board stayed its order revoking appellant's license and placed him on probation for a five-year period on the condition that he would continue with psychiatric treatment, with the psychiatrist making a written report to the board every six months. ■ ". . . Determination of a penalty is a question of fact requiring the expertise of the administrative agency and its determination

will not be overturned in the absence of a clear abuse of discretion. [Citations.]" (*Grannis* v. *Board of Medical Examiners, supra,* 19 Cal.App.3d 551, 563-564.) Based upon the medical reports in evidence, the stay of the revocation of appellant's certificate for the five-year probationary period was eminently reasonable and well designed to protect both the public and appellant's right to pursue his profession. (*Grannis* v. *Board of Medical Examiners, supra.*)

There is ample evidence to support the finding of the trial court.

The judgment is affirmed.

Stephens, J., concurred.

**KAUS, P. J.**—I respectfully dissent from the court's holding that the record before us contains substantial evidence on the vital question: whether the act of moral turpitude involved affects appellant's ability to practice his profession. Neither the court, nor the respondent board disputes the proposition that appellant cannot be disciplined merely because he has committed an act involving moral turpitude. "[T]he power of the state to regulate professions and conditions of government employment must not arbitrarily impair the right of the individual to live his private life [footnote omitted] apart from the job, as he deems fit. Likewise, here, private conduct of a man who is also a physician, is a proper concern to those who license him only to the extent that it marks him as a physician. Where his professional achievement is unaffected, where the patient community is placed in no jeopardy, his private acts are his own business and may not be the basis of discipline. . . ." (*Grannis* v. *Board of Medical Examiners,* 19 Cal.App. 3d 551, 561 [96 Cal.Rptr. 863];[1] see also *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 73, fns. 5 and 6 [64 Cal.Rptr. 785, 435 P.2d 553].)

To put this case in rather blunt perspective: appellant is apparently homosexual and on at least one occasion acted on his sexual tendency in a public toilet. Evidence that appellant's problem affects his ability to practice medicine could conceivably be of two kinds: evidence of specific instances in connection with his care and treatment of patients, or expert testimony. Neither was offered in this case. The only evidence in the record before us is to the effect that appellant is a fine physician who functions well in the patient community.

What this court is really doing is to substitute a visceral feeling that the medical achievement of a homosexual doctor must be affected by his sex

---

[1]It is evident from the context of *Grannis* that the court did not use the words "private" in the sense of "non-public," but rather as meaning "off the job."

drive—at least with respect to male patients—for evidence that this is so in this particular case. Thus there is nothing whatever in the record to support the court's statement that "appellant's problem apparently stays with him most, if not all of the time; and in light of his present conduct, there is little assurance that it will be relegated to isolated places and occasions away from his patients." This—begging my colleagues' pardon—flight of fancy is supported by nothing but a reference to the obvious fact that in the practice of medicine opportunity to falter in exercising restraint is ever present. The fact is, however, that there is no evidence that appellant has ever faltered in connection with the exercise of his profession.

Every calling has practioners who cannot or will not express their sex drive in socially or legally acceptable ways. In most professions unacceptable sexual practices usually do not endanger effective job performance. In medicine the opposite is obviously true. I suspect that the problem of the over-sexed physician—"gay" or "straight"—is as old as medicine itself. Frankly, I do not know how the medical profession has dealt with it over the years. I do know, however, that if this court's opinion is the law, any doctor who has violated acceptable standards of sexual behavior can be disciplined without proof that his deviation affects his professional competence.

While it is not a crime to be a homosexual, it requires no analysis of the Penal Code to demonstrate that homosexuals who act on their urges are more likely to run afoul of the criminal law than heterosexuals.[2] Nevertheless, certain methods of seeking to gratify even a heterosexual libido are subject to criminal sanctions. (E.g., Pen. Code, § 647, subds. (a) and (b).) Yet I cannot bring myself to believe that the court would justify disciplining a doctor on no evidence at all except proof that he has violated section 647, subdivision (b), of the Penal Code by propositioning a policewoman in "plain clothes," though we could say with just as much substance that a doctor who seeks sexual gratification by way of a sidewalk pickup, is never without his "problem" and that his intimate contact with patients of the opposite sex provides him with "opportunity to falter."

The simple fact is that men, loaded with machismo, covertly envy a doctor whose professional life brings him into intimate contact with women.

---

[2] In spite of the authorities cited by the court, I find it difficult to attach any importance to the fact that appellant has apparently violated the criminal law. While a psychiatrist may find significance in the fact that appellant's bent is such that he is willing to take the risk of exposure involved in a brush with the police, the mere fact that the Legislature has chosen to impose criminal sanctions for a particular manifestation of a doctor's sex drive, should be of no significance to the central issue—his ability to practice medicine.

They identify with the physician, rather than the patients, for whose feelings they could not care less; but in the case of the homosexual doctor they identify with the male patient and don't like the idea.[3]

As far as the psychiatrists' reports are concerned, all they tell me is that appellant has a problem. Undoubtedly therapy may help. The point is not, however, that the condition of probation imposed by the board may prove beneficial to appellant. It is, rather, that he has been disciplined on no evidence that his problem affects the practice of his profession.

I am puzzled by the court's reference to the fact that 10 of 11 members of the respondent board are licensed physicians. As a justification for their imposition of psychiatric treatment as a condition of probation, the point is quite unnecessary. (*Cadilla* v. *Board of Medical Examiners,* 26 Cal. App.3d 961, 966-967 [103 Cal.Rptr. 455].) On the other hand, if the reference is intended to justify the finding of guilt on which the basic decision to revoke appellant's license necessarily depends, I must respectfully protest the implied holding that the expertise of licensees sitting on disciplinary boards may serve as a substitute for substantial evidence that the moral turpitude of an accused licensee affects his ability to practice his calling or profession. *Morrison* v. *State Board of Education,* 1 Cal.3d 214, 227-228, footnote 21 [82 Cal.Rptr. 175, 461 P.2d 375] contains a full listing of the various professional boards which have the power to discipline licensees on grounds of moral turpitude. If the expertise of their members can take the place of evidence, the courts might as well go out of business as far as reviewing their orders on grounds of moral turpitude is concerned. I am not ready to concede that the expertise of, say, the State Board of Barber Examiners or that of the State Board of Funeral Directors and Embalmers makes it impossible to review their decisions on what acts involving moral turpitude affect the ability to cut hair or embalm.

As for the teacher cases cited by the majority—for example *Pettit* v. *State Board of Education,* 10 Cal.3d 29 [109 Cal.Rptr. 665, 513 P.2d 889] and *Moser* v. *State Bd. of Education,* 22 Cal.App.3d 988 [101 Cal.Rptr. 86]—they are clearly distinguishable on the basis of a teacher's role in our society. Parents may expect a teacher who, after all, stands in their place for several hours a day, to be an "exemplar." (*Pettit* v. *State Board of Education, supra,* 10 Cal.3d at p. 36.) The gap between

---

[3]Obviously, if the circumstances of appellant's brush with the law became public knowledge, his practice may suffer. No one can stop present or propective patients from sharing the court's instinctive feeling that being treated by appellant may lead to unpleasantness. That is unavoidable. A patient may refuse to associate with a particular doctor for no reason at all. A disciplinary board or a court must act on ·evidence.

a teacher's personal morality and its impact on his ability to function may be very narrow. On the other hand we do not go to see a doctor because we expect to pattern our lives after his.[4]

I would reverse.

---

[4] *Pettit* and *Moser* are also distinguishable on various technical, legal grounds. However, since the court has decided to affirm and it is my purpose to raise a fundamental problem with its decision, I see no point in pursuing technicalities.