[Civ. No. 15466. Third Dist. May 19, 1978.]

VINCENT B. SHEA, Plaintiff and Appellant, v.
BOARD OF MEDICAL EXAMINERS, Defendant and Respondent.

568

## COUNSEL

Hansen & Hansen, Marilyn E. S. Hansen, Robert F. Hansen and Harry E. Woolpert for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Daniel J. Weston, Deputy Attorney General, for Defendant and Respondent.

## OPINION

JANES, J.—Petitioner, Vincent B. Shea, M.D., appeals from a judgment denying his petition for a writ of mandate directed to respondent Board of Medical Examiners.* On September 29, 1972, an accusation charging unprofessional conduct as defined in Business and Professions Code section 2361 and subdivisions (d) and (e) thereof[1] was filed against Dr. Shea. It was alleged that Dr. Shea had attempted to hypnotize four patients on separate occasions and while believing them to be under

---

*Now the Board of Medical Quality Assurance (Stats. 1975, Second Ex. Sess., ch. 1.)

[1]All statutory references herein are to the Business and Professions Code unless otherwise mentioned.

Section 2361, at the time in question, provided in relevant part:

"The board shall take action against any holder of a certificate, who is guilty of unprofessional conduct which has been brought to its attention, or whose certificate has been procured by fraud or misrepresentation or issued by mistake.

"Unprofessional conduct includes, but is not limited to, the following: . . .

"(d) Gross immorality.

"(e) The commission of any act involving moral turpitude, dishonesty, or corruption, whether the act is committed in the course of the individual's activities as a certificate holder, or otherwise, or whether the act is a felony or a misdemeanor. . . ."

hypnosis, and without solicitation, described to them in lurid and salacious detail sexual foreplay and the act of sexual intercourse. Such conduct was alleged to be an improper course of treatment for the maladies of those patients.

The matter was heard on July 17 and 18, 1973, before a hearing officer for the Office of Administrative Hearings. Dr. Shea appeared in person and by counsel. The hearing officer made findings of fact, and filed a proposed decision recommending six months' suspension, with stay of the suspension for a three-year probationary period. The board agreed with the proposed decision, except as to the penalty recommended, and on January 13, 1975, issued its own decision finding Dr. Shea guilty of unprofessional conduct within the meaning of section 2361, and found in Dr. Shea's favor on the charged violations of subdivisions (d) and (e). Dr. Shea's physician's and surgeon's certificate was revoked upon condition that he be allowed to resume medical practice after submitting to a psychiatric examination for determination of his emotional ability to practice medicine. Upon resumption of his practice he was to be on probation for five years under terms usual and customary in such proceedings.

Dissatisfied with the board's decision, Dr. Shea filed this mandate proceeding (Code Civ. Proc., § 1094.5) in superior court. The board filed its return, the matter was heard, and the superior court, expressly exercising its independent judgment, made findings of fact and concluded that Dr. Shea was guilty of unprofessional conduct as charged "in that he undertook to administer treatment without first obtaining an adequate history of the patients concerned, and without adequate explanation of the mode of treatment in advance to the patients, nor was the treatment proper for the malady complained of specifically." The court approved the penalty imposed by the board, judgment was entered accordingly, and this appeal followed. We stayed enforcement of the order revoking Dr. Shea's physician's and surgeon's certificate pending resolution of the appeal and further order of this court.

Dr. Shea raises numerous contentions and questions on appeal. In essence, he contends that the statute (§ 2361) is vague and indefinite; that he was not accorded proper notice; that his "conduct" is protected by the First Amendment; that there is insufficient evidence to support the board's decision; that the penalty imposed is excessive; and that he is entitled to a dismissal of the proceeding because the board did not timely file its decision.

## Factual Background

Dr. Shea was licensed to practice as a doctor of osteopathy in 1950. In 1962, following the merger of osteopathy and allopathy, he was issued a physician's and surgeon's certificate. He took a course in hypnosis in 1970 and read many books on the subject. He also studied the subject of sexual and marital inadequacies and in the late 1950's and early 1960's began to advise people in sexology.

On February 15, 1972, 55-year old Florence Fryer and her 81-year old husband, Harry, visited Dr. Shea's office, Florence suffering from pain in her hip, Harry from a strained back. She had been Dr. Shea's patient for approximately nine years, Harry three to four years. Florence was taken to a treatment room where she donned a hospital gown. Heat pads were applied to her hip and Dr. Shea massaged her. He began a conversation, telling her to relax, but did not tell her why she was to relax. She assumed he was going to attempt hypnosis in order to help her quit smoking. Instead, he proceeded graphically to describe in explicit language the acts involved in sexual intercourse.[2] During the monologue, Dr. Shea rubbed her back in a "very caressing motion" quite unlike the manner in which he had first massaged her hip.

Florence had not, on that day or at any other time asked for a sexual consultation, nor had she ever told Dr. Shea of sexual problems. No explanation for the sexual language was given by the doctor. She found the experience "shocking" and was in a "highly emotional state" after leaving the office; it took her a week or two to get over the incident.

Harry was treated after Florence. After attending to Harry's back, Dr. Shea, to Harry's surprise, began talking about sex.[3] Like his wife, Harry had made no complaints about his sex life and was not prepared for Dr. Shea's remarks. Although he was angry about the matter, he said nothing to Dr. Shea.

---

[2] No purpose is served by detailing the precise language of the sex-talk "treatment" administered. Suffice it to say that there was a full discussion of the sexual organs, their use, and the pleasures derived from them, including Dr. Shea's statement to Florence that "there is nothing like a good fucking."

[3] "Q: What did he [Dr. Shea] say? What were the words that he was using?
"A: Well, at the beginning it was to think of nice things and relax and so on. Then, he went into a conversation, and that conversation was that I was going through a sexual situation from the beginning to the end, and it actually happened, and I laid there dumbfounded. I didn't figure out what the hell was going on."

The Fryers' experience triggered an investigation of Dr. Shea. At the request of Ira Sims, an investigator for the board, special agents Sandra Bending and Elaine Bonini each visited Dr. Shea as a patient.

Bending visited Dr. Shea five times, preparing a written report after each visit. Upon her first visit, April 6, 1972, she told the doctor that her nerves were bad and that she had a pain across her shoulders. He massaged her back, hips, and buttocks, and he asked whether she and her man massaged each other. She told him she was divorced. Dr. Shea talked about how he and his wife learned to be unashamed of their bodies and sex and how they massaged each other. He then suggested that hypnosis might help Bending's nerves and that he could do the treatment.

On her second visit Dr. Shea told Bending that he was going to hypnotize her. After assuring her that she was under hypnosis, he told her to relax, and proceeded with a sexual monologue, again in explicit, lurid detail unnecessary to repeat here even in summary. He concluded with the admonition that when she opened her eyes she would not remember what he had told her, but would want to return to him for further treatments.

On the third visit Dr. Shea again, after purporting to induce a hypnotic state in Bending, talked to her of sexual foreplay and of sexual intercourse in graphic and nonmedical terms, concluding with essentially the same admonition used previously.

Dr. Shea's conversation during her fourth visit—again after an unsuccessful attempt to induce hypnosis—related to a hypothetical vacation trip taken by Bending to a place in the mountains where she and a lover went to a room, took off all their clothes, napped, awoke, and made love. Again he went into an explicit description of the sexual foreplay and sexual intercourse which would take place. Although she was unsure whether her notes reflected the instruction not to remember the details of the conversation, she recalled that she was so advised.

Bending's final visit with the doctor was similar in all respects to her previous sessions, the only distinction being the specific content of the monologue, not its nature or quality. On each of her visits Bending pretended to be under hypnosis, but remained unhypnotized; she was not, in any instance, told that the subject of sex would be broached while she was supposedly under hypnosis.

Elaine Bonini visited Dr. Shea on June 5, 1972. She told him she had a nervous condition and he suggested that hypnosis was sometimes helpful. She at no time mentioned sexual problems or requested any treatment for problems of that nature. On her visit of June 28th she was specifically asked by Dr. Shea whether she had sex problems; she replied "No." Nevertheless, the doctor commenced discussion of a woman patient with such problems who had benefited from his treatment. After learning that Bonini had a 15-year old daughter, Dr. Shea verbally speculated on her daughter's sexual activities, despite the fact that Bonini had not herself raised the subject. Following this one-sided conversation, Dr. Shea "hypnotized" Bonini and delivered a sexually oriented and explicit monologue dealing with a vacation trip she might take with her husband.[4] At one point in this "treatment" he told Bonini that she had beautiful breasts and that "he would sure like to play with them, but that was [her] husband's job." She was fully clothed at the time.

Bonini, like the Fryers and Bending, was never actually under hypnosis, nor was she ever informed that Dr. Shea planned to talk about sexually related matters while he believed her to be hypnotized.

Dr. James Hollingsworth, senior psychiatrist at the California Men's Colony in San Luis Obispo, testified that in his opinion Dr. Shea's conduct with the Fryers, Sandra Bending and Elaine Bonini was "unprofessional," based upon Dr. Shea's failure to obtain an adequate history before subjecting the four patients to hypnosis and sex-related treatments, and the lack of a relationship between the treatment and the particular medical complaints involved. He believed the harm engendered by Dr. Shea's conduct was "in the patient-physician relationship . . . the patients are being made quite dependent on [the doctor] with this—the way the statements were made to them, and it is violating trust."

Dr. Shea admitted conversations with the Fryers concerning sex, but insisted his remarks were in response to Mr. Fryer's request for help and that he obtained Mrs. Fryer's consent beforehand. He conceded that Sandra Bending's version of his conversations with her was generally correct, and although he denied mentioning oral copulation, he admitted references to oral genital contact (i.e., "slide a ball into your mouth"). He had no intention of deviating from what he understood to be acceptable

---

[4]He told her that she and her husband would go to a cabin in the mountains; that they would go swimming; that she would take a shower and her husband would be naked in bed waiting for her. He then went on, in the most specific and lurid detail, to describe the sexual foreplay and the physical mechanics of sexual intercourse which would follow.

medical practice; his purpose was to motivate his patients to enjoy more happiness. He acknowledged that he had made an error in professional judgment; that he was too quick in diagnosing Bending's problems as sexually related, and testified that since the filing of the accusation he has made it a practice to obtain a patient's history before administering treatment.

## DISCUSSION OF CONTENTIONS

1. *Dr. Shea's challenge to the validity of section 2361 of the Business and Professions Code is without merit.*

   a. *Section 2361 is not so vague and indefinite as to deprive the doctor of due process of law.*

Section 2361 mandates the board to take action against any holder of a medical certificate who is guilty of unprofessional conduct. Contrary to petitioner's claim, section 2361 is not invalid for failing to define sufficiently what constitutes unprofessional conduct, nor is the term "unprofessional conduct" vague and overly broad.

A statute should be construed where possible in favor of its validity and is to be given a reasonable and practical construction in accordance with the probable intent of the Legislature; it is not to be declared void for vagueness or uncertainty if any reasonable and practical construction can be given its language. (*Turner* v. *Board of Trustees* (1976) 16 Cal.3d 818, 826-827 [129 Cal.Rptr. 443, 548 P.2d 1115]; *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 672-673 [114 Cal.Rptr. 345, 522 P.2d 1345].) The statute must, however, be sufficiently clear to give fair warning of the prohibited conduct; a statute which is not sufficiently clear may be made more precise by judicial construction and application of the statute in conformity with the legislative objective. (*Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231-232 [82 Cal.Rptr. 175, 461 P.2d 375]; *Aden* v. *Younger* (1976) 57 Cal.App.3d 662, 675 [129 Cal.Rptr. 535]; *Wong* v. *Regents of University of California* (1971) 15 Cal.App.3d 823, 832-833 [93 Cal.Rptr. 502].)

The purpose of the State Medical Practice Act (§ 2000 et seq.) is to assure the high quality of medical practice; in other words, to keep unqualified and undesirable persons and those guilty of unprofessional conduct out of the medical profession. (§§ 2123, 2360; *Bold* v. *Board of Medical Examiners* (1933) 133 Cal.App. 23, 25 [23 P.2d 826]; see also

*Fuller* v. *Board of Medical Examiners* (1936) 14 Cal.App.2d 734, 741-742 [59 P.2d 171].)

Section 2361 provides that "[u]nprofessional conduct includes, but is not limited to" certain enumerated conduct. (See fn. 1, *ante.*) This does not mean, however, that an overly broad connotation is to be given the term "unprofessional conduct;" it must relate to conduct which indicates an unfitness to practice medicine. (See *Cartwright* v. *Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 767 [129 Cal.Rptr. 462, 548 P.2d 1134]; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 229.) Unprofessional conduct is that conduct which breaches the rules or ethical code of a profession, or conduct which is unbecoming a member in good standing of a profession.[5] (*Board of Education* v. *Swan* (1953) 41 Cal.2d 546, 553 [261 P.2d 261].)

For example, in light of their professional expertise, schoolteachers are normally expected to be able to determine the type of conduct which constitutes unfitness to teach. (*Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 233.) No less should be expected of doctors with respect to their ability to recognize conduct evincing unfitness to practice medicine.[6] We conclude that section 2361 is not unconstitutional; it is not necessary that it enumerate specific acts which constitute unprofessional conduct. (See *Morrison* v. *State Board of Education, supra,* 1 Cal.3d at p. 233, fn. 36; *Sunseri* v. *Board of Medical Examiners* (1964) 224. Cal.App.2d 309, 312 [36 Cal.Rptr. 553].)

b. *Dr. Shea is precluded from challenging the sufficiency of the accusation.*

The disciplinary proceedings of the board must comply with chapter 5, part 1, division 3, title 2 of the Government Code. (Bus. &

---

[5]The term "unprofessional conduct" as utilized in the State Medical Practice Act covers a number of specific acts connected with the practice of medicine. (§§ 2361, 2361.5, 2361.8, 2377-2395, 2396-2411, 2528.3; *Hewitt* v. *Board of Medical Examiners* (1906) 148 Cal. 590, 592 [84 P. 39].) But nowhere is it stated that unprofessional conduct is limited to the acts so specified. (Cf. Ed. Code, §§ 7007, 44421, 87331; *Morrison* v. *State Board of Education, supra,* 1 Cal.3d at pp. 225-229, 233; *Board of Education* v. *Swan* (1953) 41 Cal.2d 546, 553 [261 P.2d 261].) The term should not be constricted so as to defeat the legislative purpose. (See *Coast Oyster Co.* v. *Perluss* (1963) 218 Cal.App.2d 492, 501 [32 Cal.Rptr. 740].)

[6]Dr. Shea's conduct most nearly approaches that defined by section 2361.5 ["Clearly excessive . . . treatment . . . as determined by the customary practice and standards of the local community of licensees, is unprofessional conduct . . . ."].

Prof. Code, § 2364.) The appropriate Government Code sections provide that the sufficiency of the accusation must be challenged within 15 days after its service, otherwise objection to its sufficiency is waived. (Gov. Code, §§ 11503, 11506, subd. (a); *Collins* v. *Board of Medical Examiners* (1972) 29 Cal.App.3d 439, 444 [105 Cal.Rptr. 634].) The record fails to show any such timely objection by Dr. Shea.

■ In any event, had Dr. Shea timely objected, his contention of inadequate notice would fail. Under the liberal rules of administrative pleading it is required only that the licensee be informed of the substance of the charge and afforded the basic, appropriate elements of procedural due process. (*Cooper* v. *Board of Medical Examiners* (1975) 49 Cal.App.3d 931, 942 [123 Cal.Rptr. 563]; *Anderson* v. *Board of Medical Examiners* (1931) 117 Cal.App. 113, 115 [3 P.2d 344].) The accusation did inform Dr. Shea that he was charged with unprofessional conduct within the meaning of the first (unnumbered) paragraph of section 2361, and of subdivisions (d) and (e) of that section, in that he had, while believing certain patients to be hypnotized, described to them in lurid and salacious detail sexual foreplay and sexual intercourse without having been solicited to do so, such "treatment" being inappropriate for the patient's complaints. Thus, the accusation sufficiently informed the doctor of the substance of the charge.

The contention that Dr. Shea was not specifically informed that he was also charged with obtaining an inadequate history from his patients approaches the frivolous. He testified and the court found that after service of the accusation he modified his practice by taking medical histories of his patients and obtaining their consent before proceeding with sexology treatment.

c. *Dr. Shea is precluded from arguing that application of the statute infringes upon his First Amendment right to free speech.*

■ Raised for the first time on appeal is the contention that the application of section 2361 to Dr. Shea's conduct infringes upon his First Amendment right to free speech. This issue could have been raised at either the administrative hearing or in the trial court; failure to do so bars its consideration here. (*Small* v. *Smith* (1971) 16 Cal.App.3d 450, 458 [94 Cal.Rptr. 136]; *Savoy Club* v. *Board of Supervisors* (1970) 12 Cal.App.3d 1034, 1042 [91 Cal.Rptr. 198]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 197 Cal.App.2d 182, 187 [17 Cal.Rptr. 167].)

■ Moreover, had the contention been properly raised, it, too, would have failed. The Legislature has the power to enact laws, within constitutional limits, to protect the safety, health, morals, and general welfare of society. (*Blinder* v. *Division of Narcotic Enforcement* (1972) 25 Cal.App.3d 174, 179 [101 Cal.Rptr. 635].) It has the right to require that those licensed to practice medicine be of good moral character, reliable, trustworthy, and not given to deception of the public or to the practice of imposing upon credulous or ignorant persons. (*Fuller* v. *Board of Medical Examiners* (1936) 14 Cal.App.2d 734, 741-742 [59 P.2d 171].) The constitutional protection accorded to speech applies here only insofar as the speech used does not impair the patient-physician relationship. (See *Fuller* v. *Board of Medical Examiners, supra,* 14 Cal.App.2d at p. 741; cf. *Palo Verde etc. Sch. Dist.* v. *Hensey* (1970) 9 Cal.App.3d 967, 974-975 [88 Cal.Rptr. 570]; *People* v. *Ledenbach* (1976) 61 Cal.App.3d Supp. 7, 11 [132 Cal.Rptr. 643].) Dr. Shea's conduct violated the trust reposed in him by his patients. Those patients were not prepared for what occurred while Dr. Shea believed them hypnotized; they were repulsed by the language used and the subject matter covered. Under such circumstances, the challenged speech is outside the ambit of constitutional protection, and the argument that a finding of Dr. Shea's unprofessional conduct will have a "chilling effect upon the right to freedom of speech and the right to practice medicine" is completely unfounded. (See *Palo Verde etc. Sch. Dist.* v. *Hensey, supra,* 9 Cal.App.3d at pp. 974-975; *People* v. *Ledenbach,* *supra,* 61 Cal.App.3d Supp. at p. 11.)

The state's obligation and power to protect its citizens by regulation of the professional conduct of its health practitioners is well settled. (*Blinder* v. *Division of Narcotic Enforcement, supra,* 25 Cal.App.3d at p. 181; *Fuller* v. *Board of Medical Examiners, supra,* 14 Cal.App.2d at p. 741.) Assuming—although we are loathe to do so—an incidental restriction of Dr. Shea's freedom of speech, the First Amendment is not an umbrella shielding the type of verbal conduct in which the doctor engaged. It does not insulate the verbal charlatan from responsibility for his conduct; nor does it impede the State in the proper exercise of its regulatory functions. (See *United States* v. *O'Brien* (1968) 391 U.S. 367, 376-377 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673]; *Cox* v. *Louisiana* (1965) 379 U.S. 559, 563 [13 L.Ed.2d 487, 491, 85 S.Ct. 476].)

2. *The trial court's judgment is supported by substantial evidence.*

■ Where, as here, the trial court has rendered its independent judgment following a review of the evidence presented at the administra-

tive hearing, the role of an appellate court is to determine only whether there is credible, competent evidence to support the trial court's judgment. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 69 [64 Cal.Rptr. 785, 435 P.2d 553]; *Petrucci* v. *Board of Medical Examiners* (1975) 45 Cal.App.3d 83, 87 [117 Cal.Rptr. 735].) All conflicts must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged in to uphold the judgment if possible; when two or more inferences can be reasonably deduced from the facts, this court is without power to substitute its deductions for those of the trial court. (*Moran* v. *Board of Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; *McLaughlin* v. *Board of Medical Examiners* (1973) 35 Cal.App.3d 1010, 1013 [111 Cal.Rptr. 353]; *Grannis* v. *Board of Medical Examiners* (1971) 19 Cal.App.3d 551, 562-563 [96 Cal.Rptr. 863].)[7]

■ In order to be subject to discipline for unprofessional conduct, Dr. Shea must have demonstrated an unfitness to practice medicine by conduct which breaches the rules or ethical code of his profession, or conduct which is unbecoming to a member in good standing of that profession. (*Cartwright* v. *Board of Chiropractic Examiners, supra,* 16 Cal.3d at p. 767; *Board of Education* v. *Swan, supra,* 41 Cal.2d at p. 553.)

■ The record amply supports the trial court's finding that the explicit descriptions of sexual foreplay and sexual intercourse were unsolicited. It also abundantly supports the finding that such descriptions were in lurid and salacious detail. Unchallenged expert testimony established that Dr. Shea's conduct was unprofessional in his failure to obtain an adequate history, the lack of relationship of the treatment to the patient's complaint, and conduct by Dr. Shea harmful to the physician-patient relationship. The trial court's conclusion that Dr. Shea was guilty of unprofessional conduct indicative of an unfitness to practice medicine is more than amply supported by the record.

There is no other profession in which one passes so completely within the power and control of another as does the medical patient. (*Fuller* v. *Board of Medical Examiners, supra,* 14 Cal.App.2d at p. 741.) The physician-patient relationship, built on trust, was violated by Dr. Shea. (See *Bernstein* v. *Board of Medical Examiners* (1962) 204 Cal.App.2d 378,

---

[7]As the Attorney General points out, Dr. Shea's brief completely disregards the function of this court where the substantiality of the evidence is questioned. The evidence supporting the accusation has thrice been weighed and his professional conduct found wanting. Enough is enough. (See *Overton* v. *Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757].)

381 [22 Cal.Rptr. 419].) Nor does the absence of any resulting physical harm negate the damage done that relationship. (See *Cooper* v. *Board of Medical Examiners, supra,* 49 Cal.App.3d at pp. 949-950.)

Completely without basis is Dr. Shea's claim that his patients consented to his "treatment." Dr. Shea's attempt to equate the patients' submission to such treatment to consent is nonsense. Consent implies positive action and always involves submission; mere passivity or submission does not include consent. (*People* v. *Perez* (1973) 9 Cal.3d 651, 658-659 [108 Cal.Rptr. 474, 510 P.2d 1026].) Consent requires a voluntary agreement, by a person of sufficient mental capacity to make an intelligent choice, to do something proposed by another. (*People* v. *Westek* (1948) 31 Cal.2d 469, 473 [190 P.2d 9].) None of the patients was forewarned of the subject matter to be covered or the language to be used. Without voluntary agreement, their submission to Dr. Shea's treatment did not amount to consent. (See *Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr. 505, 502 P.2d 1].) This is fortified by the fact that such treatment, while the patients were supposedly under hypnosis, was totally unrelated to their individual complaints.

3. *The penalty imposed is not excessive.*

In a mandamus proceeding brought to review an administrative order, the determination of penalty by the administrative body will not be disturbed absent a showing of an abuse of discretion. (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 217 [124 Cal.Rptr. 14, 539 P.2d 774]; *Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 87 [17 Cal.Rptr. 488, 366 P.2d 816].) The discretion exercised by the administrative body must be an impartial one taking into account all relevant facts, together with legal principles essential to an informed and just decision. (*Skelly* v. *State Personnel Bd., supra,* 15 Cal.3d at pp. 217-218; *Catricala* v. *State Personnel Bd.* (1974) 43 Cal.App.3d 642, 646 [118 Cal.Rptr. 89].) However, even were the penalty to appear harsh to us, still we would not be free to substitute our discretion for that of the administrative body. (Code Civ. Proc., § 1094.5, subd. (e); *Cooper* v. *Board of Medical Examiners, supra,* 49 Cal.App.3d at p. 950.) The fact that reasonable minds might differ as to.the propriety of the penalty imposed fortifies the conclusion that the administrative body acted within its discretion. (*Ibid.*; see also *Lake* v. *Civil Service Commission* (1975) 47 Cal.App.3d 224, 288 [120 Cal.Rptr. 452].)

The board revoked Dr. Shea's license with the provision that he would be entitled to resume practice after satisfying a psychiatrist selected by the board as to his emotional ability to practice medicine within the prescribed standards of ethics and competency. Following such "recertification," he was to serve a five-year probationary period upon terms and conditions imposed by the board. At the time of the disciplinary action, section 2372 empowered the board to take certain action against the holder of any certificate, including placement on probation, revocation of his certificate, or "such other action in relation to disciplining him as the board in its discretion may deem proper." (§ 2372, subds. (b), (d), (e) [Stats. 1965, ch. 1458, § 3].) The board was thus vested with discretion to determine the suitable penalty where cause for discipline existed. (*Cadilla* v. *Board of Medical Examiners* (1972) 26 Cal.App.3d 961, 967 [103 Cal.Rptr. 455].)

Section 2416 permits the board to require a psychiatric examination whenever it appears that the certificate holder is mentally ill to the extent that it may affect his ability safely to conduct the practice authorized by his certificate. Section 2372.5 enumerates some of the permissible terms of probation, including the requirement that the certificate holder submit to a complete diagnostic examination by one or more physicians appointed by the board.

As previously demonstrated, the record amply supports the trial court's findings that Dr. Shea on numerous occasions engaged in unprofessional conduct in that, upon believing a patient to be hypnotized he described to that patient, in the coarsest detail, both sexual foreplay and the mechanics of sexual congress without having been solicited to do so nor having first explained his plan; and further, that such course of treatment was not appropriate to any such patient's medical complaint. Having read the testimony of Dr. Shea and of his patients, the board could reasonably question the doctor's mental competence to practice medicine. (See § 2416; *McLaughlin* v. *Board of Medical Examiners* (1973) 35 Cal.App.3d 1010, 1017 [111 Cal.Rptr. 353].) The board did not abuse its discretion in conditioning recertification upon Dr. Shea's submission to a psychiatric examination for determination of his capacity to resume practice. (See §§ 2372, 2417.)

The terms of probation require the doctor to comply with all national, state, and local laws as well as the board's rules and regulations; they further require Dr. Shea to submit reports and to appear in person semiannually before the board. In addition, the doctor is subject to

psychiatric examination "and/or treatment as required by the Board." Based upon the evidence presented, it cannot be said that imposition of such conditions was excessively harsh; the conditions are designed to allow the doctor to resume practice and yet safeguard the public.[8]

4. *There is no showing of prejudice by reason of the board's delay in rendering a decision.*

The contention that the delay of nearly two years between the time the board heard the matter and the time it issued its decision is an "unreasonable delay in prosecution" compelling dismissal is meritless. No statute expressly limits the time within which the board must issue its decision, and no authority for his position is presented by Dr. Shea. Prejudice may not be presumed from delay alone. (*Conti* v. *Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 362 [82 Cal.Rptr. 337, 461 P.2d 617].) No claim of prejudice is made by Dr. Shea, nor can any be discerned; no action was taken against him during the two years in question. The naked allegation that a two-year delay is unreasonable must therefore be rejected.

The judgment is affirmed. The stay heretofore issued is dissolved.

Puglia, P. J., and Regan, J., concurred.

A petition for a rehearing was denied June 14, 1978, and appellant's petition for a hearing by the Supreme Court was denied July 19, 1978. Bird, C. J., did not participate therein.

---

[8]The contention that Dr. Shea was denied due process by the imposition of the condition requiring him to submit to a psychiatric examination because he was not charged in the accusation with being mentally ill is frivolous at best. The board could determine that the unprofessional conduct was the product of a mental problem which could affect the safety of the public. Such determination would authorize the board to impose, as conditions of probation, such means to safeguard the public as it deems fit. (*Grannis* v. *Board of Medical Examiners, supra,* 19 Cal.App.3d at pp. 563-564.)