Clifford L. NORTON, Appellant,

v.

John MACY et al., Appellees.

No. 21625.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 13, 1969.

Decided July 1, 1969.

Petition for Rehearing Denied Oct. 20, 1969.

Tamm, Circuit Judge, dissented.

Mr. Glenn R. Graves, with whom Mr. John W. Karr, Washington, D. C., was on the brief, for appellant.

Mr. James G. Greilsheimer, Atty., Department of Justice, of the bar of the Supreme Court of New York, pro hac vice, by special leave of court, for appellees. Asst. Atty. Gen. Edwin L. Weisl, Jr. at the time the brief was filed, Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty. at the time the brief was filed, John C. Eldridge and Robert E. Kopp, Attys., Department of Justice, were on the brief, for appellees. Mr. Julius A. Johnson, Asst. U. S. Atty., also entered an appearance for appellees.

Before BAZELON, Chief Judge, WRIGHT and TAMM, Circuit Judges.

BAZELON, Chief Judge:

Appellant, a former GS–14 budget analyst in the National Aeronautics and Space Administration (NASA), seeks review of his discharge for "immoral conduct" and for possessing personality traits which render him "unsuitable for further Government employment." As a veterans preference eligible, he could be dismissed only for "such cause as will promote the efficiency of the service." [1] Since the record before us does not suggest any reasonable connection between the evidence against him and the efficiency of the service, we conclude that he was unlawfully discharged.

I

Appellant's dismissal grew out of his arrest for a traffic violation. In the early morning of October 22, 1963, he was driving his car in the vicinity of Lafayette Square. He pulled over to the curb, picked up one Madison Monroe Procter, drove him once around the Square, and dropped him off at the starting point. The two men then drove off in separate cars. Two Morals Squad officers, having observed this sequence of events, gave chase, traveling at speeds of up to 45 miles per hour. In the parking lot of appellant's Southwest Washington apartment building, Procter told the police that appellant had felt his leg during their brief circuit of Lafayette Square and had then invited him to appellant's apartment for a drink. The officers arrested both men [2] and took them "to the Morals Office to issue a traffic violation notice."

Pending issuance of the traffic summons, the police interrogated appellant and Procter for two hours concerning their activities that evening and their sexual histories. Meanwhile, pursuant to an arrangement, the head of the Morals Squad telephoned NASA Security Chief Fugler, who arrived on the scene at 3:00 a. m. in time to hear the last of the interrogation. Fugler was then shown the officers' confidential arrest record and was permitted to monitor incognito a 20-minute interrogation of appellant held especially for his benefit.

1. 5 U.S.C. § 863 (1964), recodified in 5 U.S.C. § 7512(a) (Supp.1965–68).

2. The record leaves unclear whether they were arrested before or after Procter's statement.

Throughout, appellant steadfastly denied that he had made a homosexual advance to Procter.

At last, appellant was given his traffic summons. Fugler then identified himself to appellant and invited him down to NASA for a talk. There, in a second-floor office of the deserted "Tempo L" building, Fugler and a colleague interrogated him until after 6:00 a. m. During this interrogation, appellant allegedly conceded that he had engaged in mutual masturbation with other males in high school and college, that he sometimes experienced homosexual desires while drinking, that on rare occasions he had undergone a temporary blackout after drinking, and that on two such occasions he suspected he might have engaged in some sort of homosexual activity. He also said that he had experienced a blackout when he met Procter, recalling only that he had invited the man up for a drink.

Subsequently, in his formal reply to a notice of proposed dismissal, appellant specifically denied that he was a homosexual, that he had made an indecent advance to Procter, and that he had knowingly engaged in any homosexual activity during his adult life. Procter, however, confirmed in a written statement the story he gave the police at the time of his arrest and stated that "it would take an idiot not to be able to figure that he [appellant] wanted to have sex act on me." Procter said he had never seen appellant before that night.

NASA concluded that appellant did in fact make a homosexual advance on October 22, and that this act amounted to "immoral, indecent, and disgraceful

conduct." It also determined that on the basis of his own admissions to Fugler, even as subsequently clarified, appellant possesses "traits of character and personality which render [him] * * unsuitable for further Government employment." A Civil Service Appeals Examiner and the Board of Appeals and Review upheld these conclusions. In appellant's action for reinstatement, the District Court granted appellee's motion for summary judgment.

## II

Congress has provided that protected civil servants shall not be dismissed except "for such cause as will promote the efficiency of the service." The Civil Service Commission's regulations provide that an appointee may be removed, *inter alia,* for "infamous * * *, immoral, or notoriously disgraceful conduct" [3] and for "any * * other disqualification which makes the individual unfit for the service." [4] We think—and appellant does not strenuously deny—that the evidence was sufficient to sustain the charge that, consciously or not, he made a homosexual advance to Procter. Accordingly, the question presented is whether such an advance, or appellant's personality traits as disclosed by the record, are "such cause" for removal as the statute requires.

The Fifth Circuit Court of Appeals recently refused to consider a substantive attack on a dismissal for private homosexual conduct, apparently believing that it had no authority to review on the merits a Civil Service determination of unfitness. [5] The courts

3. 5 C.F.R. § 731.201(b) (1968).

4. 5 C.F.R. § 731.201(g) (1968).

5. *Anonymous v. Macy,* 398 F.2d 317 (5 Cir. 1968). The Court said only:
Counsel for appellant * * * argue at great length, and with considerable ability, that homosexual acts constitute private acts upon the part of such employees, that they do not affect the efficiency of the service, and should not

be the basis of discharge. That contention is not. accepted by this Court. See Hargett v. Summerfield, 100 U.S.App. D.C. 85, 243 F.2d 29 (1957). 398 F.2d at 318. Although Hargett v. Summerfield eschews any absolute bar to judicial review of a discharge on the merits, it contains language which approaches such a bar. Thus, it is not altogether clear whether the Fifth Circuit thought it had no authority to consider the argu-

have, it is true, consistently recognized that the Commission enjoys a wide discretion in determining what reasons may justify removal of a federal employee; [6] but it is also clear that this discretion is not unlimited. The Government's obligation to accord due process sets at least minimal substantive limits on its prerogative to dismiss its employees: it forbids all dismissals which are arbitrary and capricious.[7] These constitutional limits may be greater where, as here, the dismissal imposes a "badge of infamy," [8] disqualifying the victim from any further Federal employment, damaging his prospects for private employ, and fixing upon him the stigma of an official defamation of character.[9] The Due Process Clause may also cut deeper into the Government's discretion where a dismissal involves an intrusion upon that ill-defined area of privacy which is increasingly if indistinctly recognized as a foundation of several specific constitutional protections.[10] Whatever their precise scope, these due process limita-

tions apply even to those whose employment status is unprotected by statute.[11] And statutes such as the Veterans' Preference Act were plainly designed to confer some additional job security not enjoyed by unprotected federal employees. As we recently observed in a closely related context,

> The requirement that there be "cause" for discharge imposes higher duties on the Government-as-employer than merely abstaining from violation of constitutional rights, a requirement that gives no substantive content to the statute * * *.[12]

■ Accordingly, this court has previously examined the merits of a dismissal involving a statutorily protected employee charged with off-duty homosexual conduct.[13] In other cases, we have recognized that, besides complying with statutory procedural requirements, the employer agency must demonstrate some "rational basis" for its conclusion that a discharge "will promote the efficiency of the service." [14] "The ulti-

ments presented or whether it thought only that the particular matters raised fell within the area of agency discretion.

6. *E. g.*, Meehan v. Macy, 129 U.S.App. D.C. 217, 392 F.2d 822, 830 and cases cited in n. 20 (1968), vacated in part, U.S.App.D.C. (May 12, 1969) (*en banc*); Hargett v. Summerfield, 100 U.S.App.D.C. 85, 243 F.2d 29, 32, cert. denied, 353 U.S. 970, 77 S.Ct. 1060, 1 L.Ed.2d 1137 (1957) and cases cited therein.

7. Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); cf. Cafeteria & Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

8. Wieman v. Updegraff, *supra* note 7, 344 U.S. at 191, 73 S.Ct. 215.

9. That such consequences may make a difference as to the requirements of due process is recognized in Cafeteria & Restaurant Workers, etc. v. McElroy, *supra* note 7, 367 U.S. at 898, 81 S.Ct. 1743, and in Studemeyer v. Macy, 116 U.S.App. D.C. 120, 121, 321 F.2d 386, 388, cert. denied, 375 U.S. 934, 84 S.Ct. 337, 11 L. Ed.2d 265 (1963). *See also* Greene v. Mc-

Elroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L. Ed.2d 1377 (1959).

10. *See, e. g.*, Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Griswold v. Connecticut, 381 U. S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 301, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). *See also* Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Olmstead v. United States, 277 U.S. 438, 471–485, 48 S.Ct. 564, 72 L.Ed. 944 (dissenting opinion of Brandeis, J.).

11. Wieman v. Updegraff, *supra* note 7.

12. Carter v. United States, 132 U.S.App. D.C. 35, 41, 407 F.2d 1238, 1244 (1968).

13. Dew v. Halaby, 115 U.S.App.D.C. 171, 317 F.2d 582, 4 A.L.R.3d 474 (1963), cert. granted, 376 U.S. 904, 84 S.Ct. 671, 11 L.Ed.2d 605, cert. dismissed by agreement of the parties, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 550 (1964).

14. Eustace v. Day, 114 U.S.App.D.C. 242, 314 F.2d 247 (1962). *See also* Mendelson v. Macy, 123 U.S.App.D.C. 43, 46–47, 356 F.2d 796, 799–800 (1966); Carter v. United States, *supra* note 12; Leonard v. Douglas, 116 U.S.App.D.C. 136, 321 F.

mate criterion [is] whether the employer acted reasonably * * *."[15] As we summarized in Leonard v. Douglas,[16]

> Congress did not attempt a definition of "cause," providing only that it must be one that would promote the efficiency of the service. Some latitude was thus left to those responsible for administering the Act. Faithfulness to its purpose to reward those who served in the armed forces by granting a protective preference must be maintained. But the preference granted does not protect a veteran in a position when removal therefrom, viewed in the light of competing policies and all the circumstances, can reasonably be said to lead to increased efficiency in * * * governmental operations.[17]

### III

■ Preliminarily, we must reject appellee's contention that once the label "immoral" is plausibly attached to an employee's off-duty conduct, our inquiry into the presence of adequate rational cause for removal is at an end. A pronouncement of "immorality" tends to discourage careful analysis because it unavoidably connotes a violation of divine, Olympian, or otherwise universal standards of rectitude. However, the Civil Service Commission has neither the expertise nor the requisite anointment to make or enforce absolute moral judgments, and we do not understand that it purports to do so. Its jurisdiction is at least confined to the things which are Caesar's, and its avowed standard of "immorality" is no more than "the prevailing mores of our society."[18]

So construed, "immorality" covers a multitude of sins. Indeed, it may be doubted whether there are in the entire Civil Service many persons so saintly as never to have done any act which is disapproved by the "prevailing mores of our society." Analytical philosophers would distinguish between acts conventionally regarded as morally wrong and acts which are disapproved merely as indecent, repulsive, or unesthetic; but if the Commission makes such a distinction, it is of no benefit to employees, who may assertedly be dismissed for "indecent and disgraceful" conduct as well as for "immorality."

■ We are not prepared to say that the Commission could not reasonably find appellant's homosexual advance to be "immoral," "indecent," or "notoriously disgraceful" under dominant conventional norms. But the notion that it could be an appropriate function of the federal bureaucracy to enforce the majority's conventional codes of conduct in the private lives of its employees is at war with elementary concepts of liberty, privacy, and diversity. And whatever we may think of the Government's qualifications to act *in loco parentis* in this way, the statute precludes it from discharging protected employees except for a reason related to the efficiency of the service. Accordingly, a finding that an employee has done something immoral or indecent could support a dismissal without further inquiry only if all immoral or indecent acts of an employee have some ascertainable deleterious effect on the efficiency of the service. The range of conduct which might be said to affront prevailing mores is so broad and

---

2d 749 (1963); Pelicone v. Hodges, 116 U.S.App.D.C. 32, 320 F.2d 754 (1963).

15. Carter v. United States, *supra* note 12, 132 U.S.App.D.C. at 309, 407 F.2d at 1244.

16. *Supra* note 14.

17. *Id.* 116 U.S.App.D.C. at 139, 321 F.2d at 752.

18. Letter from John W. Macy, Jr., Chairman, United States Civil Service Commis-

sion, to The Mattachine Society of Washington, Feb. 25, 1966, p. 3. In his brief, appellee says:
> There can be little doubt the Commission could properly determine that Norton's conduct was "immoral." Homosexual conduct is commonly considered as "immoral" under the prevailing mores of our society, as the Commission observed in a 1966 policy statement [*i.e.,* the letter from Chairman Macy, *supra*] issued subsequent to its decision here.

varied that we can hardly arrive at any such conclusion without reference to specific conduct. Thus, we think the sufficiency of the charges against appellant must be evaluated in terms of the effects on the service of what in particular he has done or has been shown to be likely to do.[19]

## IV

In Dew v. Halaby, we upheld over strong dissent the dismissal of an air traffic controller predicated in part on homosexual acts he had committed some years before.[20] That case does not control the present controversy, since it rested on the special demands of a position entailing continuing responsibility for many lives[21] and on the fact that the appellant was a "new employee with something to hide,"[22] not an established employee who had been subjected to a mid-career investigation. Moreover, the Supreme Court granted certiorari in Dew.[23] The writ was dismissed by agreement of the parties when the FAA Administrator rescinded his adverse action against the appellant, reinstated him, and granted him back pay.[24] If these official actions may not be deemed a confession of error, the history of the case at least casts considerable doubt on the authority of what was, in any event, a narrow holding.[25]

The homosexual conduct of an employee might bear on the efficiency of the service in a number of ways. Because of the potential for blackmail, it might jeopardize the security of classified communications. As we acknowledged in Dew v. Halaby, it may in some circumstances be evidence of an unstable personality unsuited for certain kinds of work. If an employee makes offensive overtures while on the job, or if his conduct is notorious, the reactions of other employees and of the public with whom he comes in contact in the performance of his official functions may be taken into account. Whether or not such potential consequences would justify removal, they are at least broadly relevant to "the efficiency of the service."

The peculiar feature of appellant's dismissal, however, is that it rests on none of these possible effects on the service. The NASA official who fired him, Mr. Garbarini, testified that appellant was a "competent employee" doing "very good" work. In fact, Garbarini was "not worried" about any possible effect on appellant's performance, and went so far as to inquire of personnel officers "if there was any way around this kind of prob-

---

19. *See* Scott v. Macy, 121 U.S.App.D.C. 205, 207–208, 349 F.2d 182, 184–185 (1965).

20. *Supra* note 13. The appellant had admitted committing at least four unnatural sex acts with males, some of them for pay, when he was 18 or 19 years of age. He had also smoked marijuana on several occasions at about the same time. 115 U.S.App.D.C. at 172, 317 F.2d at 583.

21. The court said it could not
ignore the nature of appellant's duties. He was acting as an airport traffic controller. His duties were to regulate the flow of air traffic, issue clearances for the take-off and landing of planes, and maintain the proper separation of planes on the ground and in the air. His job thus gave him control over safeguarding the lives of passengers, crews, and persons on the ground. That such a position requires skill, alertness, and above all responsibility requires no demonstration. * * * We lack the back-

ground and experience to say, contrary to the agency's judgment, that efficiency will not be promoted by removing one from such a post as was held by appellant, when his questioned "conduct or capacity" in the past did not demonstrate qualities of character, stability, and responsibility.

*Id.* at 176–177, 317 F.2d at 587–588.

22. *Id.* at 177, 317 F.2d at 588.

23. *Supra* note 13.

24. *Id.* *See also* Meehan v. Macy, *supra* note 6, 129 U.S.App.D.C. at 217, 392 F. 2d at 830 n. 20.

25. Besides relying on the special circumstances of the sensitivity of the appellant's position and his status as a new employee subject to initial investigation, the court said it was not holding that the Civil Service Commission's reasoning in support of the discharge "would be universally valid." 115 U.S.App.D.C. at 176, 317 F.2d at 587.

lem for the man. * * * " He "considered whether or not we had real security problems here to worry about" and concluded "there was not enough of that to influence me." Appellant's duties apparently did not bring him into contact with the public, and his fellow employees were unaware of his "immorality." Nonetheless, Garbarini's advisers told him that dismissal for any homosexual conduct was a "*custom* within the agency," and he decided to follow the custom because continued employment of appellant might "turn out to be embarrassing to the agency" in that "if an incident like this occurred again, it could become a public scandal on the agency."

## V

Thus, appellee is now obliged to rely solely on this possibility of embarrassment to the agency to justify appellant's dismissal. The assertion of such a nebulous "cause" poses perplexing problems for a review proceeding which must accord broad discretion to the Commission. We do not doubt that NASA blushes whenever one of its own is caught *in flagrante delictu;* but if the possibility of such transitory institutional discomfiture must be uncritically accepted as a cause for discharge which will "promote the efficiency of the service," we

might as well abandon all pretense that the statute provides any substantive security for its supposed beneficiaries. A claim of possible embarrassment might, of course, be a vague way of referring to some specific potential interference with an agency's performance; but it might also be a smokescreen hiding personal antipathies or moral judgments which are excluded by statute as grounds for dismissal. A reviewing court must at least be able to discern some reasonably foreseeable, specific connection between an employee's potentially embarrassing conduct and the efficiency of the service. Once the connection is established, then it is for the agency and the Commission to decide whether it outweighs the loss to the service of a particular competent employee.

■ In the instant case appellee has shown us no such specific connection. Indeed, on the record appellant is at most an extremely infrequent offender,[26] who neither openly flaunts nor carelessly displays his unorthodox sexual conduct in public.[27] Thus, even the potential for the embarrassment the agency fears is minimal. We think the unparticularized and unsubstantiated conclusion that such possible embarrassment threatens the quality of the agency's performance is an arbitrary ground for dismissal.[28]

26. Apart from the incident after which he was arrested, appellant said he suspected he might have engaged in homosexual activity on three occasions since his graduation from college.

27. There is no evidence that he was ever engaged in any offensive conduct in public. His private conduct came to light only through police investigative tactics of at least questionable legality. *See* note 34, *infra.*

28. We note that the Civil Service Commission of the City of New York has recently determined that homosexual conduct is not an automatic bar to employment by the City. Rather, the Commission says:

    Policy dictates that with reference to a homosexual applicant the commission would be required to determine the personal qualities reasonably considered in-

dispensable to the duties of the position, and then to reasonably determine whether the applicant's condition is inconsistent with the possession of these qualities to the extent of rendering him unfit to assume the duties of the position.

New York Times, May 9, 1969, pp. 1, 23.

The most widely accepted study of American sexual practices estimates that "at least 37 per cent" of the American male population have at least one homosexual experience during their lifetime. Kinsey, Pomeroy & Martin, Sexual Behavior in the Human Male 623 (1948). If this is so, a policy of excluding all persons who have engaged in homosexual conduct from government employ would disqualify for public service over one-third of the male population. This result would be both inherently absurd and devastating to the public service. The public service is protected from the consequences of any

Appellee relies on the cases which have sustained dismissals on account of financial irresponsibility.[29] Some of these cases have, indeed, cited the risk of "embarrassment"[30] or "discredit"[31] to the employing agency; but the risk to which they refer involves a special kind of embarrassment. The wages of governmental employees, unlike those of other employees, are not subject to garnishment. Creditors, thus deprived of an important security and collection device, may frequently importune a federal employer to pressure delinquent employees into paying their debts.[32] Such importunings in themselves necessarily have some effect on the efficiency of the service. Moreover, it is likely that commercial establishments would refuse to extend credit to many otherwise eligible federal employees without some assurance of employer support for their collection efforts. That eventuality, should it occur, would have an obvious impact on the attractiveness of federal employ and, in turn, on the quality of the government's work product. In short, the anticipated discredit to the agency from an employee's financial delinquency is discredit with a specific sector of the public which may have an ascertainable effect on the agency's ability to perform its duties. The concern at least relates to some more concrete injury to the service than a general tarnishing of an agency's antiseptic public image. Furthermore, it is especially significant that

the Civil Service Commission apparently does not invariably discharge known financial delinquents: agencies are expected to consider the employee's good faith and to make efforts to persuade him to pay his debts as soon as possible; only inveterate and unrepentant deadbeats are to be disciplined by dismissal.[33]

■ Lest there be any doubt, we emphasize that we do not hold that homosexual conduct may never be cause for dismissal of a protected federal employee. Nor do we even conclude that potential embarrassment from an employee's private conduct may in no circumstances affect the efficiency of the service. What we do say is that, if the statute is to have any force, an agency cannot support a dismissal as promoting the efficiency of the service merely by turning its head and crying "shame."[34]

Since we conclude that appellant's discharge cannot be sustained on the grounds relied on by the Commission, the judgment of the District Court must be

Reversed.

TAMM, Circuit Judge (dissenting):

The majority once again violates the judicial cloister erected by the Administrative Procedure Act and rushes out, robes flying, into the forbidden area of administrative discretion to give kind assistance to the subject of what it feels to be highwayman tactics at the hands of the Civil Service Commission. Sensitive

such policy by its inability to identify most of the offending males. But we must assume that the Government carries many such potentially embarrassing employees on its roles without noticeable impact on the efficiency of the service.

29. Jenkins v. Macy, 357 F.2d 62 (8 Cir. 1966); McEachern v. Macy, 341 F.2d 895 (4 Cir. 1965); Carter v. Forrestal, 85 U.S.App.D.C. 53, 175 F.2d 364 (1949); cert. denied, 338 U.S. 832, 70 S.Ct. 47, 94 L.Ed. 507 (1949).

30. Jenkins v. Macy, *supra* note 29, 357 F.2d at 70.

31. McEachern v. Macy, *supra* note 29.

32. In Jenkins v. Macy, *supra* note 29, the employing agency had received "40 com-

plaints and/or contracts" from creditors of the appellant. 367 F.2d at 64.

33. *See id.* at 64–65; McEachern v. Macy, 233 F.Supp. 516, 519 (W.D.S.C.1964).

34. Appellant has also argued that the evidence against him by the agency was tainted by an illegal arrest, an illegal detention for interrogation by the police, and a third-degree inquisition of the sort courts have long outlawed in criminal cases. In view of our holding on the merits, we do not reach the difficult questions concerning the agency's use of evidence so obtained. *But see* Powell v. Zuckert, 125 U.S.App.D.C. 55, 366 F.2d 634 (1966).

to phantom defects in administrative action but insensitive to reality they turn *their* heads and cry "shame" at the same time avoiding the calling of the chorus of cases outlining the proper scope of judicial review of agency determinations. They shrug off the Commission's findings that this wayward traveler has engaged in off-duty homosexual conduct and that he experiences periods of memory "blackout" while drinking after which he assumes or suspects that he has engaged in overt homosexual activity, in order to pursue exotic ideas lurking in the legal underbrush. Picking their way across a quagmire of rhetoric they engage in casuistic reasoning, clever but false, to chide the Commission and frustrate its delegated function.

This court plainly held in the case of Hargett v. Summerfield, 100 U.S.App. D.C. 85, 88, 243 F.2d 29, 32 (1957), that "employee removal and discipline are almost entirely matters of executive agency discretion," and "that, so long as there [is] substantial compliance with applicable procedures * * * the administrative determination [is] not reviewable as to the wisdom or good judgment of the department * * * exercising [its] discretion." (Citations omitted.) I have felt constrained to follow this view time and again, *see, e. g.,* dissenting opinion in Meehan v. Macy, U.S.App.D.C. (No. 20,812, decided May 12, 1969) (*en banc*), although in so doing I remain a *vox clamantis in deserto.* With regard to this case I am convinced that the record substantially supports the action of the Commission in dismissing this man in order to promote the efficiency of the service and accordingly, I would affirm. To do otherwise would implicate me in the setting of precedent for the proposition that off-duty homosexual conduct, coupled with a capacity for "blackingout" while intoxicated, bears no real relationship to the functioning of an efficient service within a government agency. Homosexuals, sadly enough, do not leave their emotions at Lafayette Square and regardless of their spiritual destinies they still present

targets for public reproach and private extortion. I believe this record supports the finding that this individual presents more than a potential risk in this regard and that his termination will serve the efficiency of the service. Despite the billows of puffery that continue to float out of recent opinions on this subject, I believe that the theory that homosexual conduct is not in any way related to the efficiency and effectiveness of governmental business is not an evil theory—just a very unrealistic one.