James Lee MILLER, Plaintiff-Appellant,

v.

Donald H. RUMSFELD, Secretary of Defense et al., Defendant-Appellees.

No. 77–1671.

United States Court of Appeals, Ninth Circuit.

May 15, 1981.

Before BROWNING, Chief Judge, KENNEDY, Circuit Judge, and CHRISTENSEN,* District Judge.

ORDER

The panel as constituted in the above case has voted to deny the petition for rehearing of 632 F.2d 788.

The suggestion for a rehearing en banc having been submitted to a vote of the full court, there is no majority in favor of the suggestion.

The petition for rehearing is denied and the suggestion for a rehearing en banc is rejected.

Among those judges of the court voting to hear the case en banc were Judges Boochever and Norris, who file the following dissents from the rejection of the en banc suggestion.

BOOCHEVER, Circuit Judge, concurring in part with Circuit Judge NORRIS' dissent from the court's rejection of the suggestion for rehearing en banc:

Because I believe that this case presents issues of exceptional importance, I join Judge Norris in dissenting from the court's rejection of the suggestion of rehearing en banc. I further agree with the substance of Part III of Judge Norris' dissent. Assuming that the Navy's professed interests are legitimate, they cannot survive either the strict scrutiny test applicable to fundamental rights or the "heightened solicitude" test used by the *Beller* panel.

* Honorable A. Sherman Christensen, Senior United States District Judge for the District of Utah, sitting by designation.

NORRIS, Circuit Judge, dissenting from the court's rejection of the suggestion for rehearing en banc:

In *Beller v. Middendorf*, 632 F.2d 788 (9th Cir. 1980), a panel of this court upheld as constitutional a Navy regulation which requires the mandatory discharge of any member who has engaged in an act of homosexuality, without regard to individual fitness for service. As Part I of my opinion argues, the *Beller* panel seriously misconstrues the proper methodology of substantive due process analysis. Part II considers the question—avoided by the *Beller panel* —which is crucial to the proper due process analysis: whether private consensual homosexual activity is protected as an aspect of the fundamental right of privacy. Part III analyzes the Navy's justifications for the regulation and demonstrates that they are so wholly inadequate that the regulation is unconstitutional even under the *Beller* panel's approach to substantive due process. Because I believe that these are issues of exceptional importance, I must dissent from this court's refusal to rehear *Beller* en banc.

I.

The Supreme Court has stated bluntly that "[s]ubstantive due process has at times been a treacherous field . . . ." *Moore v. City of East Cleveland*, 431 U.S. 494, 502, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977). Mindful of the excesses of the *Lochner*[1] era, the Court has approached a revival of substantive due process with understandable caution and restraint. In *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), Justices Douglas and Harlan, although differing sharply over the form such review should take, urged in separate dissenting opinions that the Court resurrect substantive analysis under the Due Process Clause. Justice Douglas, wary of the specter of the *Lochner* era, observed that "[t]he error of the old Court . . . was not in enter-

1. *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905).

taining inquiries concerning the constitutionality of social legislation but in applying the standards that it did." 367 U.S. at 517, 81 S.Ct. at 1763.

Four years later, in *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Court struck down as violative of substantive due process a Connecticut statute prohibiting the use of contraceptives. The Court explicitly rejected the *Lochner* approach. *Id.* at 482, 85 S.Ct. at 1680. To guard against the dangers of the *Lochner* era, wherein the Court sat "as a super-legislature to determine the wisdom, need, and propriety of laws that touch[ed] economic problems, business affairs, or social conditions," *id.*, the *Griswold* Court adopted a categorical approach. The Court distinguished ordinary laws, which would be reviewed with great deference to the legislature, from laws which infringe activities implicating "fundamental constitutional guarantees." *Id.* at 485, 85 S.Ct. at 1682. These latter regulations the Court would closely scrutinize under the Due Process Clause. The Connecticut statute at issue in *Griswold*, because it infringed the fundamental right of privacy and could not withstand strict scrutiny, violated substantive due process.

Although individual justices have disapproved of the fundamental rights approach adopted in *Griswold* and have suggested different approaches to substantive due process analysis, the Court has yet to abandon it. *See, e. g., Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973) ("Where certain fundamental rights are involved, the Court has held that regulations limiting these rights may be justified only by a 'compelling state interest,' . . . and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake"). In *Beller*, a panel of this court nevertheless rejected the fundamental rights approach in favor of a "balancing" approach to substantive due process analysis. This court, in choosing not to rehear *Beller* en banc, enshrines as the law of this circuit a method of substantive due process analysis which the Supreme Court has scrupulously declined to adopt.

The *Beller* panel acknowledges that, as recently as *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court was firmly committed to the fundamental rights approach. *See* 632 F.2d at 807. It suggests, however, that the Court's substantive due process analysis subsequently has become more complex. *See id.* "Recent decisions," the panel concludes, "indicate that substantive due process scrutiny of a government regulation involves a case-by-case balancing . . . ." *Id.* Thus the panel, despite acknowledging that the plaintiffs' attacks on the Navy regulation "were based on the claim that the conduct prohibited by the regulation was protected as an aspect of the fundamental right of privacy," *id.* at 807, insists that "this case does not require us to address the question whether consensual private homosexual conduct is a fundamental right," *id.* The panel offers three citations for this proposition. First, the panel cites *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). *Zablocki*, however, provides no support whatsoever for a balancing approach. The Court found that the Wisconsin statute at issue in *Zablocki* directly interfered with a fundamental right—the right to marry. *Id.* at 383, 384, 386, 387, 98 S.Ct. at 679, 680, 681. Indeed, the Court specifically relied on *Griswold, supra*—the seminal case in the Court's development of the fundamental rights approach—for its substantive due process analysis. *Id.* at 384, 98 S.Ct. at 679. The *Zablocki* Court reemphasized the most significant component of that approach: "When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Id.* at 388, 98 S.Ct. at 682.

Second, the *Beller* panel cites the concurring opinion of Justice Stewart in *Zablocki*, and in particular Justice Stewart's quotation of Justice Harlan's concurring opinion in *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). Both Justice

Harlan and Justice Stewart argued for a substantive due process approach of a less categorical nature, and in that sense they do provide support for the *Beller* panel's balancing approach. It would be inaccurate, however, to suggest that this is the approach of the Court itself. Neither Justice Stewart nor Justice Harlan wrote for the majority of the Court. Justice Harlan's argument for a balancing approach is, as one would expect, eloquent and thought-provoking. Never, however, has it been accepted by the Court.

Finally, the *Beller* panel cites *Moore v. City of East Cleveland, supra*. *Moore* demonstrates that the Court is struggling with the substantive due process doctrine: the case produced six opinions. Justice Powell's plurality opinion does not, however, abandon the fundamental rights approach. Indeed, citing *Griswold, supra*, and *Roe, supra*, the Court distinguished the two categories of substantive due process cases. First, the cases involving regulations which do not infringe fundamental rights, in which regulations are upheld if they "b[ear] a rational relationship to permissible state objectives." *See* 431 U.S. at 498–99, 97 S.Ct. at 1934–35. Second, the special cases involving regulations which infringe fundamental rights, where "the usual judicial deference to the legislature is inappropriate." *See id.* The Court drew upon this fundamental/non-fundamental distinction to explain its decision in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). The Court observed that the statute held invalid in *Moore*, unlike the somewhat similar statute upheld in *Belle Terre*, "slic[ed] deeply" into a fundamental right. *See* 431 U.S. at 498–99, 97 S.Ct. at 1934–35.

The *Beller* panel simply strikes off on its own down the balancing path; it is not in any sense accurate to suggest that the recent decisions of the Supreme Court compel or even allow this. The problem with the panel's balancing approach—the reason, I suggest, that the Supreme Court has refrained from adopting it—is that it is inherently standardless. The panel's opinion in *Beller* demonstrates the result of a stan-dardless approach to substantive due process analysis: judges are left "free to roam where unguided speculation might take them." *Poe v. Ullman, supra*, 367 U.S. at 542, 81 S.Ct. at 1776 (Harlan, J., dissenting).

The *Beller* panel observes that there are "important analytic and rhetorical similarities" between substantive due process and equal protection analysis. 632 F.2d at 807. Thus it acknowledges that "where the Government seriously intrudes into matters which lie at the core of interests which deserve due process protection, then the compelling state interest test employed in equal protection cases may be used by the Court to describe the appropriate due process analysis." *Id.* at 808. This, of course, is the fundamental rights test used by the Supreme Court. The *Beller* panel implicitly holds that the conduct in question is not within that core of interests, for it concludes that the proper scrutiny of the Navy regulation "lies somewhere between" the strict scrutiny engaged in by the Court in *Roe*, and the deferential rational relationship test. *Id.* What this standard is that "lies somewhere between" the Supreme Court's two traditional substantive due process standards, the *Beller* panel fails to articulate. It deems the conduct in question deserving of some undefined "heightened solicitude," *id.* at 810, but provides absolutely no indication how this elevated constitutional status bears on infringing regulations, *i. e.*, how strong a conflicting government interest must be in order to justify infringement, and how closely related to the government's interest an infringing regulation must be in order to be constitutional. These critical factors remain a mystery under its balancing approach. The only identifiable bounds of substantive due process under the panel's approach are "the predelictions of those who happen at the time to be Members of this Court." *Moore, supra*, 431 U.S. at 502, 97 S.Ct. at 1937.

In *Moore* the Supreme Court demonstrated its commitment to the fundamental rights approach despite the difficult questions it presents—and a balancing approach avoids. The Court had to decide whether

the rationale underlying its decisions holding certain family choices to be fundamental extended to the family choice regulated by the East Cleveland ordinance. The Court's task was a difficult one because prior substantive due process cases had not considered the extended family relationship at issue in *Moore*. To hold that the choice to live with one's extended family was a fundamental right would represent an extension of the Due Process Clause's protection of the family. Justice Powell, however, did not avoid the issue by disregarding traditional categorical standards in favor of balancing, or by hedging and characterizing the right as "sort of fundamental."[2] Rather, he confronted the issue squarely, concluding that "unless we close our eyes to the basic reasons why certain rights associated with the family have been accorded shelter under the Fourteenth Amendment's Due Process Clause, we cannot avoid applying the force and rationale of these precedents to the family choice involved in this case." 431 U.S. at 501, 97 S.Ct. at 1936. The *Beller* case presents a similarly difficult choice for a court: whether the "force and rationale" of the Supreme Court's substantive due process decisions in the areas of privacy and personal choice compel that the conduct prohibited by the Navy be "afforded shelter" as a fundamental right. In all frankness, that is an issue on which reasonable persons can differ. For example, in *Berg v. Claytor*, 436 F.Supp. 76 (D.D.C.

1977), *vacated and remanded*, 591 F.2d 849 (D.C.Cir.1978),[3] the District Court held that private consensual homosexual activity between adults was not a fundamental right. Although I believe the Supreme Court's decisions compel the opposite result, I emphasize that the *Berg* court, at least, addressed the proper question.[4] It is to that question that I next turn.[5]

II.

Society's attitudes toward various aspects of sexuality and personal autonomy have changed enormously in recent years. As social issues have become legal issues, the Supreme Court has redefined the bounds of the government's power to prohibit certain activities or types of behavior. The *Beller* panel acknowledged that there is "substantial academic comment which argues that the choice to engage in homosexual action is a personal decision entitled, at least in some instances, to recognition as a fundamental right and to full protection as an aspect of the individual's right of privacy." 632 F.2d at 809. Indeed, there is. *See, e. g.*, D. Bazelon, *Probing Privacy*, 12 Gonzaga L.Rev. 587, 616–17 (1977); K. Karst, *The Freedom of Intimate Association*, 89 Yale L.J. 624, 682–86 (1980); D. Richards, *Sexual Autonomy and the Constitutional Right to Privacy: A Case Study in Human Rights and the Unwritten Constitution*, 30 Hastings L.J. 957, 1014–18 (1979); Note, *The

**2.** The Supreme Court has never recognized an intermediate level of substantive due process scrutiny which "lies somewhere between" the two traditional standards of the fundamental rights approach. Nor does it distinguish certain fundamental rights as more or less fundamental than others. *See H. L. v. Matheson*, —— U.S. ——, —— n.32, 101 S.Ct. 1164, 1188 n.32, 67 L.Ed.2d (1981) Brennan, J., dissenting (disagreeing with the Court majority's conclusion that the state regulation of the minor's right to an abortion was constitutional, and emphasizing that even the majority's theory was that "state interests inapplicable to adults" may be compelling with respect to minors, not that the fundamental rights of minors are "somehow less fundamental").

**3.** The D. C. Circuit expressly avoided consideration of the due process issue. *See* 591 F.2d at 851 n.5.

**4.** In *Beller*, the panel specifically rejected the *Berg* court's approach as an "all-or-nothing substantive due process approach" which does not "reflect the complexity of the Court's analysis." 632 F.2d at 807 n.19.

**5.** I emphasize that the Navy regulation is unconstitutional even if the *Beller* panel's rejection of the fundamental rights approach is proper. The panel acknowledges that private consensual homosexual activity must be given "heightened solicitude" under the Constitution and that some form of heightened scrutiny of the Navy regulation is therefore required. Whatever that heightened scrutiny might be under a balancing approach, the Navy regulation cannot survive it. *See* Part III, *infra.*

*Constitutionality of Laws Forbidding Private Homosexual Conduct,* 72 Mich.L.Rev. 1613, 1637 (1974).

The Supreme Court has not yet addressed the question whether private consensual homosexual activity is constitutionally protected as an aspect of the right of privacy. In *Doe v. Commonwealth's Attorney,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), the Court issued a summary affirmance of a three-judge district court's denial of injunctive and declaratory relief against a Virginia sodomy statute. The district court held that private consensual homosexual activity between adults is not protected by the right of privacy. 403 F.Supp. 1199 (E.D.Va.1975). There is strong reason to believe, however, that the Supreme Court's summary affirmance was not a judgment on the merits, but rather was predicated solely on a lack of standing. There had been no prosecution initiated or even threatened against the plaintiffs in *Doe.* The language of subsequent Court opinions tends to confirm this interpretation of *Doe.* In *Carey v. Population Services International,* 431 U.S. 678, 694 n.17, 97 S.Ct. 2010, 2021 n.17, 52 L.Ed.2d 675 (1977), the Court observed that

> Appellees argued that the state's policy to discourage sexual activity of minors is itself unconstitutional, for the reason that the right to privacy comprehends a right of minors as well as adults to engage in private consensual sexual behavior. We observe that the Court has not definitively answered the difficult question whether and to what extend the Constitution prohibits state statutes regulating such behavior among adults.

Indeed, Justice Powell, in his dissenting opinion in *Carey,* suggested that the Court's opinion subjected "all state regulations affecting adult sexual relations to the strictest standard of judicial review." *Id.* at 703, 97 S.Ct. at 2025. After *Carey,* courts and commentators have been understandably reluctant to consider *Doe* a decision on the

merits. *See, e. g., People v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980) (sodomy statute prohibiting private consensual homosexual activity violates the constitutional right of privacy); L. Tribe, American Constitutional Law, § 15–13 at 943 (1978).[6]

The Supreme Court's "modern" substantive due process decisions, beginning with *Griswold* in 1965, present a relatively compact body of law. Virtually all of those decisions deal with intimate private decisions regarding personal association and control over one's physical person. Careful analysis of those decisions indicates that their "force and rationale," *Moore,* 431 U.S. at 501, 97 S.Ct. at 1936, should be applied to find private consensual homosexual activity protected as a fundamental right.

In *Griswold, supra,* the Court held that a state statute prohibiting the use of contraceptives violated a constitutional right of privacy emanating from the specific guarantees of the Bill of Rights. The Court focused on the "notions of privacy surrounding the marriage relationship." 381 U.S. at 486, 85 S.Ct. at 1682. Thus in *Griswold,* the Court held that a married couple may engage in sexual activity for other than procreative purposes unfettered by state attempts to discourage such conduct by prohibiting the use of contraceptives.

Two years after *Griswold,* in *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), the Supreme Court held invalid, as infringing the fundamental right to marry, a Virginia miscegenation statute. The Virginia statute sought to prevent the "corruption of blood" it feared would result from sexual relations between marriage partners of different races. In effect, the *Loving* Court held that a state may not prohibit adults from voluntarily entering into a legal relationship in which, under *Griswold,* their right of private sexual intimacy would be protected.

---

**6.** If *Doe,* in fact, was not an adjudication on the merits, the conclusion of the court in *Berg, supra,* that private consensual homosexual activity is not a fundamental right is greatly undercut. The *Berg* court placed heavy reliance on *Doe* as an adjudication on the merits. *See* 436 F.Supp. at 79.

The facts of both *Griswold* and *Loving* limited the Court's protection of consensual sexual activity to the marriage relationship. Thus *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), represents a major landmark in the Court's definition of the right of privacy in sexual activity. In *Eisenstadt* a Massachusetts statute prohibited the sale or furnishing of contraceptives to unmarried persons. The Court forcefully indicated that the fundamental right of privacy in intimate sexual activity is not limited to the material relationship.

> If under *Griswold* the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional make-up. If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.

405 U.S. at 453, 92 S.Ct. at 1038 (emphasis in original).

Thus in *Eisenstadt* the Court effectively prohibited states from burdening the decision by unmarried persons to engage in sexual activity by making it more difficult for them to avoid a pregnancy. This significantly refocused the right of privacy regarding an individual's decision to engage in sexual activity. The scope of this right was extended in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), in which the Court held that a woman's choice to have an abortion is protected as an aspect of the fundamental right of privacy. Whereas *Griswold* and *Eisenstadt* prohibited the government from inhibiting sexual activity by hindering an individual's efforts to reduce the chance that his or her sexual activity would result in pregnancy, *Roe* prohibited the government from inhibiting sex-

ual activity by legislating that women could not choose to terminate pregnancies which did result. Justice Stewart, in his concurring opinion, adopted the rationale of *Abele v. Markle*, 351 F.Supp. 224, 227 (D.Conn. 1972), to explain the *Roe* Court's extension of the individual's right of control over intimate personal decisions regarding the body. " 'Certainly the interests of a woman in giving of her physical and emotional self during pregnancy and the interests that will be affected throughout her life by the birth and raising of a child are of a far greater degree of significance and personal intimacy than the right to send a child to private school protected in *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), or the right to teach a foreign language protected in *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).' " 410 U.S. at 170, 93 S.Ct. at 735, *quoting Abele v. Markle, supra*. This approach places the focus of the substantive due process inquiry on the significance and intimacy of a personal decision to the individual. So perceived, the fundamental rights to use contraceptives and to terminate an unwanted pregnancy subsequently have been extended to minor women. *See Carey, supra; Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

The *Griswold* line of substantive due process cases—*Griswold, Loving, Eisenstadt, Roe, Danforth, Carey*—indicates a consistent commitment by the Court to the view that the Due Process Clause protects the right of mature individuals to make personal choices in intimate private matters relating to one's sexual activity. Thus a mature individual has a fundamental right to choose a marital—and thus sexual—partner, to reduce the risk of pregnancy from sexual activity engaged in outside of a marriage relationship, and to terminate a pregnancy resulting from sexual activity engaged in outside a marital relationship. Both *Roe* and *Eisenstadt* cogently demonstrate that the right of privacy in sexual

matters recognized in *Griswold* cannot be narrowly confined to the marital relationship. Rather, the Due Process Clause protects the intimate personal decisions and private matters of substantial importance to the individual, regardless of whether they occur within the context of a marital relationship. I see no logically defensible reason for holding that this category of personal decisions does not include the selection of a consenting adult as a sexual partner. "A mature individual's choice of an adult sexual partner, in the privacy of his or her own home, would appear to me to be a decision of the utmost private and intimate concern." *Doe v. Commonwealth's Attorney*, 403 F.Supp. at 1199 (Merhige, J., dissenting).

It is of no significance that the conduct in question may be condemned as immoral by a majority in our society. In *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the Supreme Court indicated that even socially condemned activity is protected from infringement if carried out in private, absent some demonstrable external effect.[7] *Griswold, Eisenstadt* and *Roe*—each of which holds invalid a statute reflecting a societal judgment that the prohibited activity was immoral—make clear that the right of privacy guaranteed by the Due Process Clause is not dependent on societal approval. The Supreme Court has emphasized that it has not yet decided the question whether the right of privacy protects the private sexual behavior of consenting adults. *See Carey*, 431 U.S. at 694 n. 17, 97 S.Ct. at 2021 n. 17. Unless the Court "closes [its] eyes to the basic reason why certain rights ... have been accorded shelter under the Fourteenth Amendment's

due process clause," *Moore*, 431 U.S. at 501, 97 S.Ct. at 1936, it cannot avoid applying the "force and rationale," *id.*, of its precedents involving intimate personal decisions regarding sexuality to find private consensual homosexual activity protected by the fundamental right of privacy.

### III.

The *Beller* panel acknowledges that the reasons which led the Supreme Court to protect certain intimate personal decisions suggest that private consensual homosexual activity be afforded "heightened solicitude" under the Due Process Clause. 632 F.2d at 810. As discussed in Part I of this opinion, *supra*, an unbroken line of substantive due process decisions by the Supreme Court mandates that "heightened solicitude" under the Due Process Clause must take the form of strict scrutiny of infringing regulations. That scrutiny requires a critical analysis of the strength of the government's interests, and the availability of less restrictive alternatives for achieving the government's legitimate goals.[8]

### A. The Existence and Strength of the Navy's Interests

A Civil Service mandatory discharge rule for homosexuals was held invalid in *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969). The court stated that "a policy of excluding all persons who have engaged in homosexual conduct from government employ" would be "inherently absurd" and violative of due process. *Id.* at 1167 n. 28. "[T]he notion that it could be an appropriate function of the federal bureaucracy to enforce the majority's conventional codes of conduct in the

---

7. Stanley was convicted under a Georgia obscenity statute for "knowingly hav[ing] possession of ... obscene matter" in his home. The Georgia Supreme Court affirmed the conviction, holding that it was "not essential to an indictment charging one with possession of obscene matter that it be alleged that such possession was 'with intent to sell, expose or circulate the same.'" 224 Ga. 259, 161 S.E.2d 309, 311 (1968). The United States Supreme Court reversed, citing *Griswold* and holding that such possession was protected by the fundamental right of privacy. 394 U.S. at 564–65, 89 S.Ct.

at 1247–48. "Whatever may be the justifications for other state statutes regulating obscenity, we do not think that they reach into the privacy of one's own home." *Id.* at 565, 89 S.Ct. at 1248.

8. These factors also are components in the *Beller* panel's balancing test. *See* 632 F.2d at 807. Had the panel actually critically examined these factors, it could not have avoided the conclusion that the Navy regulation is unconstitutional. *See* Part III; *see also* n. 5, *supra*.

private lives of its employees is at war with elementary concepts of liberty [and] privacy . . . ." *Id.* at 1165. The reasoning of *Norton v. Macy* is compelling. The *Beller* panel seeks, therefore, to factually distinguish the Navy regulation before it. Seizing upon the "nature of the employer," 632 F.2d at 810, the *Beller* panel notes the "importance of the military's role," *id.* at 812, and concludes that it requires a "unique accommodation between military demands and what might be constitutionally protected activity in some other contexts." *Id.* As noted in *benShalom v. Secretary of the Army*, 489 F.Supp. 964, 976 (E.D.Wis.1980), however, "[t]he peculiar nature of Army life has always required the melding together of disparate personalities. For much of our history, the military's fear of racial tension kept black soldiers segregated from whites. Fear of sexual tensions, until very recently, kept the participation of female soldiers to a minimum." That the vital mission of the Navy survived the elimination of those policies, which were at one time deemed essential, is reason to be skeptical of the Navy's claim here that the mandatory discharge of all homosexuals is a military necessity.

Military necessity, to be sure, is a weighty governmental interest. "But the concept of military necessity is seductively broad and has a dangerous plasticity. Because they invariably have the visage of overriding importance, there is always the temptation to invoke security 'necessities' to justify an encroachment on civil liberties. For that reason, the military-security argument must be approached with a healthy skepticism . . . ." *Brown v. Glines*, 444 U.S. 348, 369, 100 S.Ct. 594, 614, 62 L.Ed.2d 540 (1980) (Brennan, J., dissenting). The *Beller* panel was easily seduced. It accepted without critical scrutiny the Navy's statement of its interests and the importance of those interests. The panel made no attempt to respond to the devastating observations of Judge Schwarzer regarding those professed interests, *see Saal v. Middendorf*, 427 F.Supp. 192 (N.D.Cal.1977).[9] The *Beller* panel cites *Glines, supra*, for the proposition

that "[r]egulations which might infringe constitutional rights in other contexts may survive scrutiny because of military necessities." 632 F.2d at 811. This use of *Glines* is rather disingenuous, however, since the panel failed to follow the Supreme Court's example and critically examine the alleged military necessity. The *Glines* Court upheld the regulations at issue only after close scrutiny; the *Beller* panel gives the Navy regulation no critical scrutiny at all. The regulations upheld in *Glines* prohibited conduct which reasonably could be deemed a clear danger to military loyalty or a material interference with the accomplishment of a military mission. 444 U.S. at 355, 100 S.Ct. at 600. Contrast the meager finding of the *Beller* panel that the prohibited activity has some "rational" connection to concerns which have "some basis in fact." 632 F.2d at 808–09 n. 20, 812. Nowhere did the *Glines* Court indicate that the regulations before it could have been sustained on so tenuous a connection to so speculative a concern. Moreover, the regulations upheld in *Glines* were extremely narrowly tailored, requiring a case-by-case determination by the Air Force whether the legitimate military concerns were implicated. Contrast the Navy regulation upheld in *Beller*, which sweeps as broadly as possible, requiring discharge for a single act of homosexuality— whether engaged in while in the Navy or before leaving civilian life—without any examination whether the Navy's concerns are implicated in the particular case or whether the member is otherwise fit for service.

Considered with proper detachment rather than knee-jerk acquiescence, the military necessity argument is revealed not to be supported by the record in *Beller*. The *Beller* panel identifies four Navy interests which implicate the service's ability to efficiently accomplish its mission:

(1) protection of the "the fabric of military life," *id.*;

(2) preservation of the "the integrity of the recruiting process," *id.*;

---

**9.** Judge Schwarzer found the regulation to be "irrational and capricious," *i. e.*, unable to survive even the minimal rational basis test. 427 F.Supp. at 203.

(3) maintenance of the "discipline of personnel in active services," *id.*; and

(4) assurance of the "acceptance of men and women in the military, who are sometimes stationed in foreign countries with cultures different from our own," *id.*

The Navy contends, and the *Beller* panel uncritically agrees, that the regulation furthers these interests because:

(1) tension will arise between homosexuals and heterosexuals, because the "great majority of naval personnel . . . despise/detest homosexuality," 632 F.2d at 811 and n.22;

(2) undue influence caused by emotional relationships among homosexuals will "subvert" the proper performance of duties or chain of command, *id.*;

(3) the ability of homosexuals to perform supervisory or command duties will be "degraded" by their inability to "maintain the necessary respect and trust," *id.*; and

(4) recruiting effort will be adversely affected by parents' concerns about their children "associating with individuals who are incapable of maintaining high moral standards," *id.*

First and fundamentally, the *Beller* panel is simply wrong in accepting all of these as legitimate interests. The Navy is not in the business of promoting its own moral views or shielding the moral sensibilities of Navy personnel and citizens of host nations. Rather, as the Supreme Court has bluntly stated, "the primary business of . . . navies [is] to fight or be ready to fight wars should the occasion arise." *Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955). Admittedly, to prepare for this vital role the Navy permissibly may "insist upon a respect for duty and a discipline without counterpart in civilian life." *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). Never, however, has the Navy offered anything to indicate that maintenance of such discipline war-readiness requires that the private lives of Navy members meet the approval of other members, citizens of host nations, or the Navy

itself. Intolerance is not a constitutional basis for an infringement of fundamental personal rights. Yet intolerance or a presumption of intolerance is at the very root of each of the dangers which the Navy asserts is posed to its interests by homosexuals.

Moreover, careful consideration of these professed concerns reveals them to be so weak that they cannot possibly survive any form of heightened scrutiny, much less the strict scrutiny which is appropriate. None of the problems accepted by the *Beller* panel is in any way confined to homosexual activity. All, in fact, are at least as pronounced with respect to other groups not subject to mandatory discharge, such as women and racial minorities. "In other words, the problems which the Navy enumerates to support blanket exclusion of persons who engage in homosexual acts are problems which are endemic to a heterogeneous society such as the Navy and with which it deals in the ordinary course of its operations on a case-by-case basis." *Saal v. Middendorf*, 427 F.Supp. at 201. "Without impairment of its efficiency or effectiveness, it has abandoned the stereotypes of the past that have stigmatized women and members of minority races in favor of judging the fitness of individuals on their merits." *Id.* at 203. With respect to other conduct or personal traits, the Navy has an elaborate system for case-by-case determinations of fitness. Yet for homosexual activity—ironically an extremely personal form of human conduct—the Navy's approach remains wholly untailored. The fitness of these plaintiffs, and the absence of the feared problems from their cases, has never been denied by the Navy.

The Navy could assert identical fears as a basis for the blanket discharge or rejection of groups other than homosexuals, and the unconstitutionality would be unquestioned. The Navy recently has witnessed "tensions and hostility" between members of various racial groups, many of whom may "detest" and "despise" other races. Yet obviously the Navy could not constitutionally bar all blacks from service, regardless of whether

the majority of Navy personnel despise them.

Similarly, emotional relationships may—and surely do—occur between male and female Navy personnel. Yet the Navy obviously may not bar all women from service simply because some emotional relationships might negatively affect proper command relationships. The same can be observed of the Navy's fear of the inability of some personnel to gain the respect and trust of those they command. This problem could—and no doubt does, in some instances—arise because the commander is black or is a woman. Yet the Navy obviously could not constitutionally bar all blacks or all women even if they were not respected by the majority of Navy personnel.

The other problems accepted by the *Beller* panel as justifications for discharging all homosexuals are posed to at least as great an extent by people who engage in conduct which is not grounds for mandatory discharge. Parents of potential Navy recruits may be—and no doubt are—concerned about many things their children may encounter in the Navy. It is simply absurd, however, to suggest that the possibility of association with homosexuals is so major a concern of parents that mandatory discharge of homosexuals from the Navy is required. Certainly parents are more concerned about their children associating with persons who use dangerous illegal drugs. Yet drug abuse, like gambling, alcoholism, and adultery, is not grounds for mandatory discharge. Moreover, homosexuals participate in all walks of life. They are in Boy and Girl Scouts, on high school faculties and athletic teams, and in church groups; they work in factories, stores, restaurants, and offices. In short, parents can shield their children from incidental association with homosexuals only by shielding them from the world.

The Navy also professes a concern that homosexual members will offend citizens of host nations. As noted, I do not accept that the Navy has a legitimate interest in protecting the sensibilities of intolerant persons in foreign countries. Even if such an interest does exist, however, the Navy regulation bears only the most tenuous relationship to it. Persons in host nations are more likely to be offended by more noticeable characteristics such as race or sex, or such frequently *public* behavior as drug use or drunkenness, than by the *private* activity prohibited by the Navy. Never have the plaintiffs contended that the Navy could not discharge members for public homosexual conduct.

The Navy regulation, ultimately, cannot prevent the problems which the Navy fears even with respect only to homosexuals. Much of the tension and hostility, absence of trust and respect, offended sensibilities, and parental apprehension which concerns the Navy, flows not from the fact of a private sex act, but rather from related public behavior. Yet much potentially offensive public behavior other than actual sexual activity is beyond the Navy's power to control. Public expressions or encouragements of homosexuality as a personal philosophy, and public displays of behavioral tendencies or traits commonly perceived as homosexual, clearly are more likely than private conduct to arouse hostility, create tension, or offend sensibilities. Yet such disruptive public behavior may not constitutionally be prohibited by the Navy. *See benShalom v. Secretary of the Army, supra.*

**B. The Possibility of a Less Restrictive Alternative**

The *Beller* panel's analysis is similarly uncritical with regard to the possibility of less restrictive alternatives to the mandatory discharge rule. Without any supporting analysis or discussion, it simply rejects as impractical the possibility of "achieving the Government's goals by regulations which turn more precisely on the facts of an individual case . . . ." 632 F.2d at 810. This has no support in the record. As noted, the Navy already uses individual fitness hearings as a wholly adequate method of dealing with the very types of concerns expressed in *Beller* when they occur in the context of conduct or behavior other than homosexuality. The panel gives no expla-

nation of why it would be impractical to use this existing system to provide case-by-case determinations when the problems arise with respect to homosexual members. Moreover, "relative impracticality" is an insufficient ground for foregoing an alternative which enables achievement of government interests by means less restrictive of an activity deserving heightened constitutional solicitude. *See Wengler v. Druggists Mutual Ins. Co.,* 446 U.S. 142, 151–52, 100 S.Ct. 1540, 1546–47, 64 L.Ed.2d 107 (1980) (blanket rule held invalid despite administrative inconvenience of case-by-case determinations). The *Beller* panel's conclusion that case-by-case determinations are fatally impractical seems rather disingenuous where, as here, the basic mechanism for such determinations is already used extensively by the Navy.

## IV.

The *Beller* panel's opinion has two basic flaws. First, it seriously misapplies substantive due process analysis, rejecting, in favor of some standardless balancing process, the fundamental rights approach established by an unbroken line of Supreme Court decisions. This error in methodology has significance extending far beyond the specific legal issue presented by the Navy regulation. Given unwarranted credence by this court's refusal to rehear the case en banc and delineate the correct approach to substantive due process analysis, the panel's approach will create confusion and conflict in the law of this circuit. Second, the opinion, despite the panel's assertions, reflects no solicitude whatsoever for the conduct in question. It accepts the claim of military necessity uncritically, gives virtually no scrutiny to the Navy's professed interests, requires virtually no showing of connection between the Navy's regulation and the goals identified, and upholds the constitutionally protected activity despite the clear existence of a practical, less restrictive alternative. In sum, the *Beller* panel's opinion is wholly unsupported in the law.

Federal Rule of Appellate Procedure 35(a) provides that a case may be reheard en banc when it presents a question of exceptional importance. It seems clear to me that the proper judicial approach to substantive due process analysis of government regulations, and the constitutional status of private homosexual behavior among consenting adults, are issues of the most extreme importance. This court acts imprudently in refusing to afford them its greatest attention. I would rehear *Beller* en banc.